IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA; THE STATE OF FLORIDA; *ex rel.* Florida Society of Anesthesiologists, | ) ) ) | Civil Action No. 8:13-cv-2603-T-27AEP |
| | ) | |
| Plaintiffs, | ) | |
| **v.** | ) ) | **JURY TRIAL DEMANDED** |
| Umesh Choudhry, an individual; Curvv, LLC, a Florida Limited Liability Company; Advanced Anesthesia Associates, LLC, a Florida Limited Liability Company; All Services Anesthesia, LLC, a Florida Limited Liability Company; North Pinellas Surgery Center, LLC, a Florida Limited Liability Company; North Pinellas Surgery Center Holding Company, LLC, a Florida Limited Liability Company; St. Petersburg Endoscopy Center, LLC, a Florida Limited Liability Company; E Street Endoscopy LLC (*dba* West Coast Endoscopy Center), a Florida Limited Liability Company; Safety Harbor Surgery Center, LLC, a Florida Limited Liability Company; Clearwater Ambulatory Surgery Centers, Inc., a Florida corporation, *dba* Clearwater Endoscopy Center; Physicians Endoscopy Holdings Inc., a Florida Corporation (collectively, Choudhry Defendants); AS WELL AS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Jack Groover, an Individual; Borland-Groover Clinic, a Florida Corporation; BGC Holdings, a Florida corporation, Jax Anesthesia Providers, LLC, a Florida Limited liability Corporation; and Southpoint Anesthesia, LLC, a Florida Limited Liability Corporation (collectively, Groover Defendants); | ) ) ) ) ) ) ) | |
| | ) | |
| AND John Doe 1-1000; Jane Doe 1-1000, | ) | |
| | ) ) ) | |
| Defendants. | ) | |

## THIRD AMENDED FALSE CLAIMS ACT COMPLAINT
## AND DEMAND FOR JURY TRIAL

*NOW INTO COURT*, through undersigned counsel, by, on behalf of, and in the name of the United States of America and the State of Florida, comes Relator Florida Society of Anesthesiologists, which submits this Third Amended Complaint pursuant to the Federal Rules of Civil Procedure Rule 15(a)(1) for the purpose of being more specific regarding the allegations in this case, as well as conforming the Complaint with factual developments in the case which (1) as to Choudhry, requires (a) the addition of four (4) Choudhry anesthesia companies, and (b) the substitution of West Coast Endoscopy Centers Holdings, LLC, a Florida Limited Liability Company, with E Street Endoscopy LLC (*dba* West Coast Endoscopy Center), a Florida Limited Liability Company; and (2) as to Groover, requires (c) the addition BGC Holdings, Inc., a Florida corporation.

1.     As required by the False Claims Act, Relator voluntarily submitted prior to the filing of this complaint, a confidential written disclosure statement (subject to the attorney-client and common interest privileges to the United States Government and the State of Florida containing material evidence and information in its possession pertaining to the allegations contained in this complaint.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §3730(b), which allows a private person to bring suit for a violation of the False Claims Act pursuant to 28 U.S.C. §1345 and which provides the District Courts with original jurisdiction over all civil actions commenced by the United States of America pursuant to 28 U.S.C. §1331.

3.      The acts proscribed by 31 U.S.C. §3729 et seq. and complained of herein were performed by the Defendants who transact business and reside in this district. Therefore, this Court has personal jurisdiction over Defendants and venue is proper in this district pursuant to 31 U.S.C. §3732(a).

4.      Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) and (c) because the Defendants are subject to personal jurisdiction in this District and transact business in this District.

5.      The Florida Medicaid False Claims Act claims are filed pendent to the federal claims filed herein and pursuant to Fla. Stat. Ch. §68.081 et seq.

**<u>PARTIES</u>**

6.      Relator Florida Society of Anesthesiologists ("FSA") is a not-for-profit professional organization of nearly 2,000 anesthesiologists throughout the State of Florida.  As a professional league whose purpose is to promote the common interests of its members, Relator is the alter-ego of its members in relation to those common interests.  As such, FSA receives, analyzes, and collects reports and information from its members.  The allegations in this case arise and/or involve first-hand interactions with Defendants in this case and the activities at issue in this Complaint. See, e.g., *U.S. ex rel. Minnesota Ass'n of Nurse Anesthetists v. Allina Health System Corp., et al.*, 276 F.3d 1032, 1049 (8th Cir. 2007) ("No courts have held that corporations responsible for the discovery of information cannot have 'direct knowledge' because they have to act through agents…There is no hint in the history of the 1986 Amendments Act that Congress intended to disqualify organizational relators….An association's knowledge is in no way parasitic of its members and is "direct" within the meaning of the [FCA]."  *Id*. at 1050.

7.     Relator's members have personal knowledge of the allegations in this Complaint and, by extension, so does Relator, having received numerous specific and credible reports from FSA members who are identifiable individuals with demonstrable high professional standing in the medical community.  They have identified Defendants and activities at issue in this lawsuit with the specificity necessary to render the allegations credible and specific so as to form the basis for the Complaint.

8.     Defendants are GI physicians and related entities that have engaged in a fraudulent scheme of extracting and paying kickbacks for referrals of anesthesia services in violation of the Anti-Kickback Statute and the False Claims Act since at least 2012 and continuing to this day.  An understanding of the space in which the fraud took place is critical and follows.

## **CASE BACKGROUND**

### The Specialty Physician/Surgeon

9.     Physicians may be specialists or practice primary care. Primary care physicians are generalists, such as family doctors, gynecologists and pediatricians. They build long-term relationships with their patients, counseling them on wellness and lifestyle choices, as well as treating their illnesses. Specialists, in contract, focus on specific diseases, such as cancers or breathing disorders, or specific parts of the body, such as the *digestive system* or the eyes. Specialists typically see patients for specific conditions, rather than providing general care. Both types of physicians treat illnesses, injuries and other conditions with medicines, physical therapy and other non-surgical techniques.  Only some of those physicians conduct surgical procedures on the patients they treat.  Those who perform little or no surgery are simply referred to as

physicians. Those who also perform surgical procedures are referred to as surgeons. In other words, all surgeons are physicians, but not all physicians are surgeons.

10.     One example of a specialty area where the physician may also be a surgeon is ophthalmology, where the physician/surgeon evaluates and diagnose eye conditions in a private office setting, but also performs procedures on patients which are surgical in nature, like cataract surgery or a retina procedure, in a surgical setting.

11.     This lawsuit involves physician/surgeons who focus on the *digestive system* and who conduct surgical procedures particular to that specialty, such as colonoscopies, endoscopies, and sigmoidoscopies. The specialty is known as gastroenterology and the physician/surgeons are often referred to as "GI" doctors. GI doctors conduct their work in private office settings where they see patients, but also perform surgeries in operating rooms at ambulatory surgery centers (ASCs) and hospitals.

<u>The Advent of ASCs</u>

12.     Historically, GI surgical procedures were performed in hospital outpatient departments, rather than private offices, because the use of anesthesia required the safeguards of a hospital setting that is equipped to handle emergencies or surgical complications.

13.     With the advent of Ambulatory Surgical Centers (ASCs), a great number of these procedures are now performed in ASCs. The Ambulatory Surgery Center Association defines ASCs as health care facilities that focus on providing same-day surgical care, including diagnostic and preventive procedures which are an *alternative* to hospital-based outpatient procedures.

14.     Physician ownership of ASCs exploded in the last decade, particularly in specialties that perform surgical procedures, such as Gastroenterology, which now account for

nearly two thirds of all procedures performed in ASCs in the United States.  In 2010, ninety (90) percent of ASCS were owned by physician/surgeons.

15.     Like hospitals, ASCs receive a *facility fee* from payors, which compensates the ASC (and its owners) for the use of the ASC.  Because the facility fee is ancillary revenue to the ASC owner/surgeon, it incents the ASC owner (who is also the referring physician) to conduct patient procedures there, rather than at a regular hospital.

16.     The physicians/surgeons who conduct the surgery also receive a *professional fee* from payors, which compensates them for the personal services performed by them in connection with the surgery.

17.     The individual defendants in this case, owner/surgeons Choudhry and Groover, respectively, are GI physicians with ownership interests in multiple ASCs as further detailed in this complaint.  They are both the referrers of their patients for surgery; the surgeons who perform the surgery; and the surgeon/owners of the facility in which they perform the surgery.

18.     When physicians refer patients to facilities in which they have ownership (a self-referral), the physicians receive payment for their professional services, as well as a share in the profits of the facilities they own.  Recognized by legislators and regulators as an inherent conflict of interest and a driver of inappropriate use of services, the foregoing had two regulatory consequences:

A.     It led to the passage of a series of laws beginning in 1989 with the "Stark Law" to regulate self-referrals. See 42 U.S.C. 1395nn.

B.     It also led in March 2010 to the passage of the Patient Protection and Affordable Care Act ("PPACA"), H.R. 3590, Section 6001, Pub. Law No. 111-148, 111 Congress 2010, which curtailed growth in physician ownership of surgical facilities by prohibiting

both the creation of new and the expansion of existing physician-owned outpatient facilities.  For additional information on this topic, please see *Physician Ownership in Hospitals and Outpatient Facilities* (Center for Healthcare Research and Transformation July 2013), which is attached as Exhibit 1.  PPACA allowed existing physician-owned hospitals to continue if they already had a Medicare provider agreement in place as of December 31, 2010, as is the case with the ASCs at issue in this case.

19.     Specialists who are the surgeons and the owners of the ASCs in which they do the surgeries exercise total control over the referral of any additional services that patients require incident to the surgery, like anesthesiology.  GI physicians are not trained to perform anesthesia any more than anesthesiologists are trained to do surgeries.

20.     Having been grandfathered, the *facility* fees physician/surgeons receive from the ASCs they own is not at issue in this lawsuit.  What is at issue in this lawsuit are the kickbacks these owners/surgeons extract from the other medical professionals – the anesthesiologists – as a condition for referrals made to them in the surgery centers the physician surgeons own.  It is this practice that is illegal and the basis for this lawsuit.

<u>The Prohibition against Remuneration-Induced Referrals</u>

21.     The Stark laws are meant to safeguard against corrupted self-referrals, as described in more detail in the Legal Framework section below, by banning physicians from profiting for self-referrals of designated health services (which include ancillary services like lab and imaging).  These self-referrals are unlawful unless the physician can show that they fall within exacting exceptions which are the physician's burden to prove.

22.     For example, while the Stark law allows physicians to receive revenue from services that are personally performed by them, such as surgeries, they cannot derive revenue

from services that the physician refers to entities it owns which are not personally performed by the referring physician (unless an exception applies).  The rationale for the prohibition is two-fold:

> A.     When services, such as surgery, are personally performed by a physician surgeon, the personal effort required in conducting the surgery (and the limited hours in a day to personally perform such services) minimizes the likelihood that the physician will perform services that are unnecessary solely for a profit motive.

> B.     In contrast, the same safeguard is not present when the physician refers services to third parties; since the performance of referred services does not require personal effort, allowing the physician to profit from those referrals would generate a revenue stream to the physician that is unlimited other than by the number of referrals made to third parties, thus creating a perverse incentive to over-refer for profit rather than medical necessity.

> See, e.g., L. Casalino, *Physician Self-Referral and Physician-Owned Specialty Facilities,* Research Synthesis Report No. 15 (Princeton, J.J: Robert Wood Johnson Foundation), available at
>
> http://www.rwjf.org/content/dam/farm/reports/issue_briefs/2008/rwjf28861/subassets/rwjf28861_1

23.     Anchored in the same principles as Stark, the Anti-Kickback Statute makes it actionable for physicians to offer or receive remuneration in exchange for a referral of professional services, such as anesthesia, which is compensated by a government program, such as Medicare; if one purpose of the remuneration is to induce the referral, the remuneration constitutes an unlawful kickback.  See, e.g., *U.S. v. Greber*, 760 F.2d 68, 72 (3rd Cir. 1985).  Like Stark, AKS contains exacting exceptions, known as safe-harbors, which the physician must prove.

24.     This lawsuit involves a practice by the misleading name of the "company model" which, as practiced by Defendants in their respective rings which are further detailed below, is a scheme by which Defendants systematically receive kickbacks for the anesthesia referrals they make and, moreover, pay kickbacks to physicians inside and outside of their medical groups for the anesthesia services they refer to "company model" anesthesia companies owned by Defendants (even though they are not anesthesiologists).

<u>Anesthesia Revenue from Services in ASCs</u>

25.     When a procedure or surgery requires anesthesia, the professional services of a medical doctor of anesthesiology ("MDA" or anesthesiologist) is necessary, who may provide those services along with either a Certified Registered Nurse of Anesthesiology ("CRNA") or an Anesthesiologist Assistant (AA), who must both work under the supervision of a physician.

26.     Just like a surgeon receives a professional fee for any surgeries he personally performs at an ASC, anesthesiologists (and CRNAs) also receive a *professional fee* for their personally performed anesthesia services, which fee is separate and apart from the facility fee paid to the ASC and separate and apart from the professional fee paid to the surgeon, which usually and in this case is also the owner of the ASC.

27. Historically, anesthesia services at ASCs were provided by medical anesthesia groups that were independent from the surgeons/ASC owners who referred the patients for anesthesia.

28.     Because not all procedures at ASCs require anesthesia and, further, not all procedures that require anesthesia should be performed at ASCs (many can and should be conducted with sedation or take place in a regular hospital), the independent medical judgment

of the anesthesiologist was a means to ensuring the appropriateness of the need for anesthesia services and the safety of proceeding with an anesthetic given the patient's medical condition.

29.     Historically, therefore, the surgeon referrers did not have access to the revenue stream from the anesthesiology professional fee paid to the anesthesiologist for the services he performed in the ASC, even though surgeons/ASC owners had referred the patient and owned the ASC.

30.     Feeling entitled to capture the anesthesia revenue stream from "their" patients, "their" surgeries, and "their" ASCs, many of these referring physician/surgeons set out to develop arrangements by which they could capture the revenue stream generated by the anesthesia services provided by the anesthesiologist.  That is exactly what occurred in this case. Relator is privy to numerous incidents prior to 2012 when surgeons at all ASC Defendants in this case complained openly and in the anesthesiologists' presence about the anesthesiologists making "too much money" and about how it should be the surgeons that made money on anesthesia since they were the ones with (referring) the patients."

31.     To that effect, referring physicians/ASC owners (like Choudhry and Groover, as described below) began to demand kickbacks for the anesthesia referrals from the anesthesia providers; the American Association of Nurse Anesthetists ("AANA") and the American Society of Anesthesiology ("ASA") described the foregoing as a proverbial "shaking-down" of anesthesia providers.  See Exhibits 5 and 6 (Letters to the OIG).  When the anesthesia providers refused to capitulate to these kickback demands, they were terminated and were replaced by anesthesia arrangements ("company model" arrangements) through which the physician referrers/ASC owners could take for themselves kickbacks for their own anesthesia referrals, as

well as pay kickbacks to referrers of anesthesia cases to the anesthesia companies the GI surgeons created.

32.     The company model deployed by Defendants was an attempt to accomplish through the back door what they could not do through the front door; to wit, extract kickbacks for their referrals of anesthesia cases to anesthesiologists.

## THE REGULATORY FRAMEWORK

### Anti-Kickback Statute

33.     In 1972, Congress enacted the federal health care Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b et seq., which prohibited payments, directly or indirectly designed to induce a person to refer or recommend services that may be paid for by federal government. AKS also provides that those who knowingly and willfully solicit or receive, offer or pay anything of value, whether directly or indirectly, in exchange for or to induce the referral of items or services for which a federal health care program may make payment shall be guilty of a felony.  See 42 U.S.C. § 1320a-7b(b)(1).

34.     To be a kickback, the value that is conveyed to a referrer does not need to be an outright payment to the referrer.  There are many artifices by which value can be conveyed; to wit, forgiving an obligation conveys value, charging less than fair market value conveys value, providing services of anything in kind without a commensurate payment conveys value. Regardless of how value is conveyed, it is a *kickback* if *one* purpose is to induce referrals for services covered by Medicare or Medicaid.

35.     The purpose of the AKS is to protect the Medicare and Medicaid programs from increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than the cost, quality of care, or necessity of services.

11

36.     The "company model" at issue in this lawsuit results in a negative bidding war between physician/surgeons and anesthesiologists in which the anesthesiologists selected by the surgeons are generally those who will work for the least amount of compensation. The foregoing does not result in "savings" to Medicare or Medicaid, which pay services based on a fixed fee schedule.  Rather, it maximizes the spread available as a kickback to the referring physician, promotes over-utilization of anesthesia by surgeons, and results in a race to the bottom in terms of quality of patient care.

37.     Violations of AKS form a basis for FCA liability.  See 42 U.S.C. § 1320(a)-7b(g). Complying with AKS is essential to protecting Medicare and Medicaid and is material to payment and participation in government-funded health care programs.

38.     Defendants know that such compliance is a condition of participation in and payment by the Medicare and Medicaid programs, among other government programs.

A.      Upon enrollment in the Medicare program, Defendants agree to abide by the Medicare laws:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

CMS Form 855B, Section 15 (Certification) Paragraph 3.

B.      Further, upon enrollment in the Medicare program, Defendants agree to not present or cause to be presented a false claim (i.e., a claim that violates the law, including Stark or AKS):

> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

CMS Form 855B, Section 15 (Certification) Paragraph 6.

C.   Providers must bill for anesthesia services in the CMS-1500 form, which requires the provider to certify that each bill complies with the program's requirements for reimbursement:

> Because this form is used by various government and private health programs, see separate instructions issued by applicable programs.
>
>     ***
>
> Notice [as to Medicare, CHAMPUS, FECA, and Black Lung programs]: any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a crime… and may be subject to civil penalties.
>
>     ****
>
> Notice [as to Medicaid]: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under Federal or State laws.

CMS-1500 Form.

39.   Thus, at enrollment and with each billing for anesthesia services, Defendants necessarily certified compliance with such laws. Those certifications were false because the services were not reimbursable as a result of the kickback scheme at issue in this case, thereby rendering each bill a false statements and a false claim for reimbursement.

40.   Medicare is a public program designed to provide medical assistance to the elderly and the disabled which is funded entirely by the federal government.

41.   Medicaid is a jointly-funded federal-state program that enables states, such as Florida, to provide medical assistance to persons whose income and resources are insufficient to

meet the costs of necessary medical services.  In Florida, the federal government pays for approximately 53 percent of all Medicaid health care services.

42.     Anesthesia referrals are not reimbursable by Medicare or Medicaid if the parties to the referral exchanged remuneration where one purpose of the value exchanged was to induce the referral.  The government's payment to Defendants for such unlawful referrals constitute the primary level of damages in this case.  The second level of damages in this case are any other fees for services billed or caused to be billed by Defendants that were induced by the anesthesia kickbacks, such as fees for surgeries that took place at particular ASCs in order to gain access to the system of kickbacks put in place by Defendants.

43.     No later than 2012 and continuing to this day, Defendants systematically billed and caused bills for anesthesia referrals induced by kickbacks to be submitted to government programs, as further detailed below.

44.     The specific content of each specific bill for anesthesia services that was submitted to the government is inconsequential to liability in this case, in that liability arose by reason of the underlying financial arrangements, which tainted every anesthesia bill.  See, e.g., *U.S. ex rel. Bingham v. HCA, Inc.,* 2016 WL 344887 at *8 (S.D. Fl. January 28, 2016) ("[T]he fraud alleged in this action does not depend as much on the particularized billing content of any given claim.  Instead, 'improper relationships with referring physicians taint every claim submitted as a result of those referrals.' While Relator has not provided specific samples of false claims submitted by HCA, the facts alleged provide sufficient "indicia of reliability" that HCA submitted false claims to the government for payment") (internal citations omitted).

<u>The Federal False Claim Act ("FCA")</u>

45.     A cause of action under the FCA arises when any person knowingly presents or causes to be presented a false or fraudulent claim for payment or approval by government funds. 31 U.S.C. §3729(a)(1)(A).

46.     A cause of action under the FCA also arises when any person knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.  31 U.S.C. §3729(a)(1)(B).

47.      As defined under 31 U.S.C. §3729(b)(1), "knowing" and "knowingly" means: (i) acting with actual knowledge of the information; (ii) acting in deliberate ignorance of the truth or falsity of the information; or (iii) acting in reckless disregard of the truth or falsity of the information and that statute makes clear that it does not require proof of specific intent to defraud.

48.     Bills for anesthesia referrals that were induced by kickbacks are not reimbursable by Medicare or Medicaid and constitute false claims.

49.     In addition, the FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim for payment or approval is liable for a civil penalty of not less than $5,500 and up to $11,000 for each such claim, and three times the amount of the damages sustained by the government.

50.     The qui tam provision of the FCA empowers private entities, such as Relator, which have information regarding a false or fraudulent claim against the government to bring an action on behalf of the government.

<u>The Florida Medicaid False Claims Act</u>

51.     The Florida Medicaid False Claims Act provides that any person who knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or

decrease an obligation to pay or transmit money or property to the state is liable for the full amount of damages incurred by the State due to the false statement, and for each claim a civil penalty of not less than $5,500.00 or more than $11,000.00 plus triple the amount of damages suffered by the state as a result of the conduct. Fla. Stat. Ch. 68.081(g).

52.     Similar to the federal False Claims Act, the Florida Medical False Claims Act provides a cause of action for an individual to bring a cause of action on behalf of the State of Florida against defendants for false and/or fraudulent Medicaid claims. Fla. Stat. Ch. 68.083(2).

### SPECIFIC ALLEGATIONS REGARDING CHOUDHRY RING

#### Choudhry's Anesthesia and Related Companies

53.     Defendant Umesh Choudhry is a physician of Gastroenterology ("GI"), licensed in the State of Florida. He is not an anesthesiologist.

54.     Under his NPI number 1093872871, he billed Medicare $1,424,700.84 in calendar year 2014 for GI services to 1,086 Medicare beneficiaries.  This sum does not include the facility fees he collected as an owner of the ASCs to which he referred his surgical cases or the anesthesia fees he received for the cases he referred and received for his company model companies, even though he is not an anesthesiologist.

55.     Choudhry engaged in the fraud at issue in this case through and with the Choudhry Defendants that follow no later than early 2012 and continuing to this day.  Exhibit 2 is a color-coded chart of the Choudhry Defendants illustrating the control and identity overlaps between them.

56.     At all times relevant to the allegations in the Complaint, Choudhry was the owner or part owner of Defendants Curvv, LLC; Advanced Anesthesia Associates, LLC ("AAA"); several Sub Anesthesia Companies listed below (Choudhry's Sub Anesthesia Companies), and

several Ambulatory Surgery Centers listed below (Choudhry's ASCs), all entities through which Choudhry extracted kickbacks for his anesthesia referrals and, further, paid kickbacks to other physician/surgeons for their anesthesia referrals.

57.     Defendant Curvv, LLC is a Florida Limited Liability Company doing business at 1773 Long Bow Lane, Clearwater, Florida 33764, which is controlled by Choudhry and directly and/or indirectly participates in the fraud at issue in this case. It serves as a manager of anesthesia companies at issue in this action; to wit, AAA and Anesthesia Services Group.

58.     Defendant Advanced Anesthesia Associates, LLC ("AAA") is a Florida Limited Liability Company with its registered office at 9887 4th Street North, Suite 234, St. Petersburg, Florida 33702.  AAA is a professional organization which is controlled by Choudhry and directly and/or indirectly participates in the fraud at issue in this case.

59.     Through Curvv and/or AAA, directly and/or indirectly, Choudhry controls a number of other anesthesia entities, all doing business from 9887 4th Street North, Suite 234, St. Petersburg, Florida 33702, AAA's address, including but not limited to Defendants:

    a.  First Priority Anesthesia, LLC;
    b.  Anesthesia Services Group, LLC;
    c.  All Services Anesthesia, LLC;
    d.  Premier Anesthesia of the Sunshine State, LLC; and
    e.  Coastal Anesthesia Group, LLC

(collectively "Choudhry's Sub Anesthesia Companies), which supply anesthesia services to Choudhry's ASCs; to wit, North Pinellas Surgery Center, St. Petersburg Endoscopy Center, Safety Harbor Surgery Center, West Coast Endoscopy Center, and Clearwater Endoscopy Center (collectively, Choudhry's ASCs).

60.     John Doe 1-1000 and Jane Doe 1-1000 is a place holder allegation for those other individuals and companies (including holding companies) which have been interposed in the

scheme at issue to extract kickbacks from anesthesia services and to pay kickbacks to other physicians for their referrals of anesthesia services to Choudhry anesthesia model companies.

61.     Choudhry and all the companies set forth herein as part of the Choudhry ring are collectively referred to as "Choudhry."

<u>The Referrers of Anesthesia and Recipients of Choudhry's Kickbacks</u>

62.     Defendant Physicians Endoscopy Holdings, Inc. is a State of Florida Corporation with a principal address is 616 E. Street, Suite A, Clearwater, Florida.  At all times relevant to the allegations in the Complaint, it was partly owned by Choudhry and directly and/or indirectly through its physician owners referred anesthesia services to Choudhry and extracted directly or indirectly through its physician owners kickbacks for the referrals made to Choudhry. It is a 49% owner of Defendant E Street Endoscopy, LLC dba West Coast Endoscopy Center.

63.     Numerous other surgeons at the ASCs in question also referred anesthesia cases to Choudhry's companies in exchange for anesthesia remuneration.

64.     John Doe 1-1000 and Jane Doe 1-1000 is a place holder allegation for those other individuals and companies (including holding companies) which participated in the scheme by making referrals of anesthesia services to Choudhry and receiving or serving as conduits for kickbacks for such referrals.

<u>The ASCs where the Anesthesia Services are provided</u>

65.     Defendant North Pinellas Surgery Center LLC (also referred to as "North Pinellas ASC") is a Florida Limited Liability Company with its offices in 2323 Curlew Road, Bldg 5, Dunedin, Florida 34698.  It is an ASC which at all times relevant to the allegations was a Choudhry ASC, as well as the situs of anesthesia services by First Priority Anesthesia, LLC, a Choudhry Sub Anesthesia Company.

66.     Defendant North Pinellas Surgery Center Holding Company, LLC is a State of Florida Limited Liability Company located at the same address as North Pinellas Surgery Center LLC.  Upon information and belief, it is the holding company of North Pinellas Surgery Center LLC, a Choudhry ASC.

67.     Defendant St. Petersburg Endoscopy Center, LLC (also referred to as "St. Petersburg ASC") is a State of Florida Limited Liability Company located at 560 Jackson Street North, Suite 200, St. Petersburg, Florida 33705.  It is a an ASC which at all times relevant to the allegations was a Choudhry ASC, as well as the situs of anesthesia services by Anesthesia Services Group, LLC, a Choudhry Sub Anesthesia Company.

68.     INTENTIONALLY OMITTED

69.     Defendant E Street Endoscopy, LLC is a Florida Limited Liability Company located at 616 E. Street, Clearwater, Florida  33756 (converted from E Street Endoscopy, Inc), which does business as West Coast Endoscopy Center (also referred to as "West Coast ASC"). It is a an ASC which at all times relevant to the allegations was a Choudhry ASC, as well as the situs of anesthesia services by Premier Anesthesia of the Sunshine State, LLC, a Choudhry Sub Anesthesia Company.

70.     Defendant Safety Harbor Surgery Center, LLC (also referred to as "Safety Harbor ASC") is a State of Florida Limited Liability Company located at 3280 N. McMullen Booth Road, Suite 110, Clearwater, Florida 33761.  It is an ASC which at all times relevant to the allegations was a Choudhry ASC, as well as the situs of anesthesia services by All Services Anesthesia, LLC, a Choudhry Sub Anesthesia Company.

71.     Defendant Clearwater Ambulatory Surgery Centers, Inc. (also referred to as "Clearwater ASC") is a Florida Corporation doing business as Clearwater Endoscopy Center

located at 401 Corbett Street Suite 220, Clearwater, Florida 33756.  It is an ASC which at all times relevant to the allegations was a Choudhry ASC and the situs of anesthesia services by Coastal Anesthesia Group, LLC, a Choudhry Sub Anesthesia Company.

72.     John Doe 1-1000 and Jane Doe 1-1000 are those other individuals and ASCs (including holding companies) which participated in the scheme.

<u>Deployment of Choudhry's Ring In a Nutshell</u>

73.     Choudhry is at a center of a scheme of kickbacks for anesthesia cases referred at the ASCs in question by him and others in west Florida. His private practice is Physicians Endoscopy Holdings.

74.      Choudhry, a GI physician, acquired ownership and contractual interests in numerous ASCs, including North Pinellas ASC, St. Petersburg ASC, Safety Harbor ASC, West Coast ASC, and Clearwater ASC (collectively, Choudhry's ASCs).

75.     Choudhry himself performs endoscopic GI procedures at Safety Harbor and West Coast ASCs.   The color coded Chart attached as Exhibit 2 shows the overlap in ownership of ASCs by Choudhry and a handful of individuals working with Choudhry.

76.     All of the foregoing ASCs previously used independent outside anesthesia service providers, most commonly Bay Area Anesthesia, L.L.C. ("BAA") and Anesthesia Associates of Pinellas County ("AAPC"), as detailed below.

77.      In early 2012, all of the foregoing ASCs demanded that the outside anesthesiologists pay kickbacks to the ASC owners/referrers in exchange for anesthesia referrals, as detailed below.

78.     All of the outside anesthesia providers turned down the demand for kickbacks, as detailed below.

79.    All of the foregoing ASCs then replaced these legitimate outside anesthesia providers with Choudhry's anesthesia companies, as detailed below.

80.    Choudhry's anesthesia companies obtained such referrals by paying kickbacks to the referrers, as detailed below.

81.    Relator reliably knows that Choudhry pays kickbacks to the referrers because of the events that led to the termination of the anesthesia companies, as well as the events that followed Choudhry's anesthesia companies assuming the anesthesia contracts, as detailed below.

<u>BAA and North Pinellas ASC, West Coast ASC, St. Petersburg ASC and Clearwater ASC</u>

82.    In early 2012, Bay Associates Anesthesia ("BAA"), an independent anesthesia company provided anesthesia at North Pinellas ASC, West Coast ASC, St. Petersburg ASC, and Clearwater ASC.

83.    In early 2012, Sean Singh, AAA's business manager made a proposal to the North Pinellas ASC Board to replace BAA pursuant to a model whereby North Pinellas directly or through their surgeon owners could participate in the anesthesia revenues generated by AAA.

84.    Upon information and belief, the same proposal was made to West Coast ASC, St. Petersburg ASC, and Clearwater ASC.

85.    Following the North Pinellas proposal, a meeting was called in 2012 between the Board members of the ASC (which included Choudhry) and the members of BAA, anesthesiologists Tom Root, John Raddin, and Deborah Kaplan.

86.    The North Pinellas ASC owners presented the BAA members with the AAA model and asked for the arrangement to be matched by BAA; namely, to allow the North Pinellas ASC owners to receive payments for their anesthesia referrals in the form of a portion of the anesthesia fees.

87.    BAA turned down the arrangement, having concluded that it was unlawful.

88.     At the end of that meeting, one of the physician board members of North Pinellas ASC publically remarked that "[the other board members] realize the quality will suffer, but they don't want to leave money on the table."

89.     The demand to share in the anesthesia revenue was a demand for kickbacks.

90.     After BAA turned down the kickback demand, BAA's contract at North Pinellas ASC was terminated and replaced with Choudhry's sub-anesthesia company First Priority Anesthesia, LLC, which is "managed" by AAA.

91.     Likewise, BAA's contract at West Coast SC was also terminated and replaced with Choudhry's sub-anesthesia company, Premier Anesthesia of the Sunshine State, LLC, , which is  "managed" by AAA.

92.     Predictably, BAA's contract at St. Petersburg ASC was also terminated and replaced with Choudhry's sub-anesthesia company, Anesthesia Services Group LLC, which is "managed" by AAA.

93.     Further, BAA's contract at Clearwater ASC was also terminated and replaced with Choudhry's sub-anesthesia company, Coastal Anesthesia Group, LLC, which is "managed" by AAA.

94.     The above ASCs all entered into company models with Choudhry by which Choudhry, through AAA and its subs, took kickbacks for his anesthesia referrals and paid kickbacks to ASC surgeon anesthesia referrals to Choudhry's companies.

95.     From the date of each contract in 2012 to this day, every single referral to Choudhry, AAA, and the subs was tainted by kickbacks and billings for same constituted false claims.

AAPC and Safety Harbor ASC

96.     In early 2012, Anesthesia Associates of Pinellas County (AAPC), an independent anesthesia company provided anesthesia at Safety Harbor ASC.

97.     Following the same pattern as with the other ASCs, in early 2012, Sean Singh, AAA's business manager made a proposal to the Safety Harbor ASC Board to replace AAPC pursuant to a model whereby Safety Harbor ASC directly or through their surgeon owners could participate in the anesthesia revenues generated by AAA.

98.     Following the proposal, the member owners of Safety Harbor ASC, which included Choudhry, communicated to one of the members of AAPC, Dr. Alan Rudolph, that Safety Harbor ASC would be terminating AAPC's anesthesia contract in July of 2012 to go on company model with Choudhry because Choudhry would share a portion of the anesthesia revenue with them.

99.     In June of 2012, while AAPC was awaiting its impending termination from Safety Harbor ASC, the OIG opinion that was the subject of paragraph 237-245, explained that the company model in which Safety Harbor ASC was about to embark presented kickback issues. The opinion became known to the owners of Safety Harbor ASC.

100.    As a result of the OIG opinion, Safety Harbor ASC allowed AAPC to remain at Safety Harbor past the July of 2012 termination date.

101.    Safety Harbor ASC's intentions to engage in a company model and reasons for retaining AAPC (for the time being) were discussed extensively by Safety Harbor ASC members with an FSA member and AAPC anesthesiologist, Jay Epstein.

102.    Specifically, Safety Harbor ASC surgeon owners Ted Small (a general surgeon), Robert Davidson (a general surgeon), Brian Oliver (an orthopedic surgeon) and Dana Deupree (an ophthalmologist) told Dr. Epstein on multiple occasions that they were holding off from

terminating AAPC and going on company model with Choudhry for a while "to see if anyone went to jail."

103.   By November of 2012, no one had gone to jail and these same surgeon owners of the Safety Harbor ASC told Dr. Epstein "we are going for it."

104.   In November of 2012, Safety Harbor ASC terminated AAPC's contract and deployed Choudhry's anesthesia model company All Services Anesthesia, LLC.

105.   From the date of this contract, every single referral to Choudhry, AAA, and the subs was tainted by kickbacks and billings for same constituted false claims.

<u>The Choudhry Defendants Knowingly Submitted False Claims to Medicare</u>

106.   For all the Choudhry ASCs, Choudhry's "central" entity, Advanced Anesthesia Associates (AAA) engages the independent contractors that staff the anesthesia referrals at the ASCs.

107.   Through AAA, Choudhry entered into contracts with anesthesiologists and CRNAs as 1099 contractors who service the ASCs, including  but not limited to:

   a.   Nagegh Baylur, MDA at West Coast ASC.
   b.   Vivian Benci, MDA at North Pinnellas ASC.
   c.   Steven Feinerman, MDA at Safety Harbor ASC.
   d.   Ngoc Nguyen, MDA at St Petersburg ASC.
   e.   Michael Thomas Woods, MDA at Safety Harbor ASC.

108.   Defendant AAA pays these contractors via direct deposit their 1099 earnings based on an hourly rate for work actually done.  There is no work volume guaranteed and no fixed time guaranteed ahead of time for these contractors.

109.   In other words, the contractors providing the services do not present any risk to Choudhry or the entities through which they are being paid.  The anesthesia contractors have no written contracts in place to guarantee a minimum number of cases they will perform, much less

guaranteed hours on a weekly or monthly basis.  Further, their schedules are not set in advance so that the anesthesia contractors can anticipate their work to be performed until the surgeons at the ASCs book their captive patients for procedures in which they will use anesthesia.

110.   Choudhry's central entity "AAA" has continuously held NPI number 1124297650 from CMS.  However, AAA does not directly bill Medicare or Medicaid.

111.   Instead, the services and anesthesia billings for each ASC are tracked through each sub, as shown by the billing sheet instructions given to the contractors which is attached as Exhibit 3.  Anesthesia contractors, thus, are given written instructions that they must bill each of these sub-entities (Coastal for Clearwater Endoscopy Center, Premier for West Coast Endoscopy Center, All Services for Safety Harbor Surgery Center, Anesthesia Services for St. Petersburg Endoscopy Center, and First Priority for North Pinellas Surgery Center).

112.   These sub-anesthesia entities also do not bill Medicare or Medicaid directly.

113.   Operationally, AAA collects the billing information for each ASC/sub anesthesia company, as submitted by the contractors, and then bills government programs for the contractor's services under each anesthesia contractor's individual NPI number.

114.   For example, in 2014, AAA billed Medicare the following on behalf of the anesthesiologists practicing under this scheme (which billings do not include billings for CRNAs supervised by these anesthesiologists):

    a.   $18,899.40 for Negesh Bailur, MD for 24 Medicare Beneficiaries.

    b.   $44,665 for Vivian Benci, MD for 258 Medicare beneficiaries.

    c.   $262,465.75 for Steven Feinerman, MD for 222 Medicare beneficiaries.

    d.   $448,808.33 for Ngoc Nguyen, MD for 307 Medicare beneficiaries.

    e.   $98,361.18 for Thomas M. Woods MD for 156 Medicare beneficiaries.

115.    These contractors do not collect their own billings.  Instead, AAA obtains an assignment from them as a condition for the contractors' ability to practice at the ASCs.

116.     After collecting the information from the contractors, AAA, through the use of a billing intermediary and an accounting firm, codes the bills from the contractors, submits claims to CMS for these charges, and receives the entirety of the billings for these services.

117.    Although the contractors are required to bill each sub for anesthesia services at each ASC and all bills are submitted to AAA, AAA does not bill Medicare and Medicaid under the NPI number of each sub or under its own NPI number.  Clearly, the reason that AAA/the subs do not centrally bill Medicare, even though they go through the trouble of breaking out per sub and per ASC the services of the contractors, is to diffuse accountability for the practices at issue in this lawsuit.

118.    It is apparent that the reason that AAA requires the contractors to break out per sub and per ASC the anesthesia services is to allow the accounting personnel inside AAA and/or Choudhry's network of entities to segregate company model funds and kickbacks on an ASC by ASC basis.  Note that the ASCs do not have complete overlap in ownership, thus calling for ASC by ASC calculations.

119.    Among other accounting professionals, Choudhry uses Laurie Gammill and outside professional accountants, such as Brenda Marshall (of the CPA Firm of PDR Certified Public Accountants) for this purpose.

120.    AAA pays the contractors rates significantly lower than what Choudhry bills and receives from payors, such as Medicare.

121.    The difference or spread between the invoiced charges to Medicare and the payment to the contractors forms the *res* that is used to fund the kickbacks.

122.    For example, under Choudhry's arrangement with Safety Harbor ASC, the anesthesiologist servicing Safety Harbor ASC receives approximately $300,000 in compensation, but generates approximately $900,000 in anesthesia revenues on anesthesia cases referred by Safety Harbor ASC.  Even accounting for approximate overhead and other expenses, the delta between what Choudhry collects for these services ($900,000) and what he pays the contractor ($300,000) leaves close to $500,000 in profit from the anesthesia billings that is shared with the Safety Harbor ASC owners/referrers.

123.    While the exact amount and mechanism for the funneling of the kickbacks back to the ASCs/referrers is uniquely within the knowledge of the defendants, the payment of the kickbacks can reliably be inferred from the genesis of the relationships whereby the original anesthesia providers received demands for kickbacks, were terminated for not providing such kickbacks, and were replaced by the Choudhry entities.

124.    Further, after the ASCs went on company model with Choudhry, contractor/s have reported to FSA *hundreds* of incidences of referrer/surgeons at the ASCs, including but not limited to GIs Michael Zelig, Anoop Goyal, and John Ann, boasting openly about how much money they were making from anesthesia services since Choudhry's companies began to perform them.

125.    Relator is also privy to the existence of text messages in which exchanges about these transfers of value are captured which will be sought in discovery.

126.    Apart from engaging the contractors and being the central repository for the revenue generated by the contractors at each ASC, AAA manages all other anesthesia affairs at the ASCs.

127.     AAA, as well as all of the anesthesia subs, are managed by Sean Singh, who reports to and runs all decisions regarding anesthesia affairs back to Choudhry.

128.     Despite the fact that these services were ineligible for reimbursement by government programs because they were procured through kickbacks, Choudhry billed government programs for these services.

129.     Further, the kickback arrangement for services performed at the ASCs was also an inducement for Choudhry and the surgeon/owners receiving the kickbacks to increasingly perform their surgeries in those ASCs, thus generating facility and professional fees tainted by the kickbacks.

130.     For example, following the kickback scheme, the ASCs billed Medicare for facility fees for surgeries, as follows:

A.     North Pinellas ASC has been continuously submitting claims to Medicare and other government programs through NPI number 1750333746. In calendar year 2014 alone, North Pinellas ASC submitted claims to Medicare totaling $3,824,806.52 for services rendered to 1,692 Medicare beneficiaries that calendar year. Upon information and belief of Relator, approximately 30% of all North Pinellas ASC patients are Medicare.

B.     Clearwater ASC has been continuously submitting claims to Medicare and other government programs through NPI number 1417949280 through its corporate entity Clearwater Ambulatory Surgery Centers, Inc. In calendar year 2014, Clearwater ASC submitted claims to Medicare totaling $1,160,688, for services rendered to 804 Medicare beneficiaries that calendar year.   Upon information and belief of Relator, approximately 50% of Clearwater ASC patients are Medicare.

C.      St. Petersburg ASC, where Choudhry personally does surgeries, has been continuously submitting claims to Medicare and other government programs through NPI number 1689682247.  In calendar year 2014 alone, St. Petersburg ASC submitted claims to Medicare totaling $2,775,000, for services rendered to 1,935 Medicare beneficiaries that calendar year. Upon information and belief of Relator, approximately 70% of the St. Petersburg ASC patients are Medicare.

D.      West Coast ASC has been continuously submitting claims to Medicare and other government programs through NPI number 1912900143 through its corporate entity Defendant E Street Endoscopy LLC dba West Coast Endoscopy.  In calendar year 2014 alone, West Coast ASC submitted claims to Medicare totaling $4,251,772, for services rendered to 1,163 Medicare beneficiaries that calendar year. Upon information and belief of Relator, approximately 50% of the West Coast AC patients are Medicare.

E.      Safety Harbor ASC has been continuously submitting claims to Medicare and other government programs through NPI number 1700190352.  In calendar year 2014 alone, Safety Harbor ASC submitted claims to Medicare totaling $4,812,914, for services rendered to 1,183 Medicare beneficiaries that calendar year,   upon information and belief of Relator, approximately 30% of Safety Harbor ASC patients are Medicare.

        The Scheme Led to Over-Utilization of Anesthesia at Choudhry's ASCs.

131.    With the adoption of the company model, which unlawfully allowed referring physicians to profit from anesthesia services provided by third parties, physician owners/referrers then sought to maximize those kickbacks by substantially increasing the number of anesthesia cases.

132.    For example, at North Pinellas ASC and during its contract with BAA, anesthesia was used in approximately 60% of the procedures.  After BAA was replaced by one of Dr. Choudhry's entities, the anesthesia utilization increased to nearly 100% of the procedures.

133.    Further, because the length of the procedure became controlled by the surgeon now participating in the anesthesia revenue, the company model also led to longer procedures for patients.  Anesthesia is reimbursed by units; therefore, the longer the procedure, the higher the reimbursement.    The danger to patients who then need for additional drug management is obvious.

134.    One purpose (if not the sole purpose) for the foregoing scheme was to induce and reward anesthesia referrals to third parties in violation of the law.

135.    In fact, at one point, one of the ASCs physicians at Safety Harbor ASC left the ASC only to later want back in.  However, he was not allowed to return because he did not bring enough endoscopy business to the ASCs that could be serviced by the anesthesia provider and generate revenues back to the ASC and its owners.

### Conclusion regarding Choudhry Ring

136.    In sum, beginning no later than 2012 and continuing to this day, Choudhry deployed a company model scheme for the purpose of extracting kickbacks for referrals from anesthesiologists and for the purpose of inducing others to refer anesthesia services to him/his companies in exchange for a kickback on those referrals.

137.    The Choudhry Defendants knowingly participated in the kickback scheme.

138.    The kickbacks tainted all billings for services to Medicare and other government payors.

139.     The Choudhry Defendants submitted and caused to be submitted bills that were false claims for which they are jointly and severally liable.

## SPECIFIC ALLEGATIONS REGARDING GROOVER RING

### Groover's Anesthesia and Related Companies

140.     Defendant Jack Groover is a physician of Gastroenterology ("GI") licensed in the State of Florida. He's not an anesthesiologist.  Groover engaged in the fraud at issue in this complaint through and with the entities that follow no later than 2012 and continuing to this day.

141.     Defendant Jack Groover is registered and therefore qualified to submit claims to Medicare and other government programs since receiving his NPI number on or about July of 2005.  This does not include the facility fees he collects as an owner of the ASCs to which he and his group refer surgical cases, as well as the anesthesia fees which he and his group receives for their anesthesia referrals, as well as anesthesia referrals by others, although none of them are anesthesiologists.

142.     At all times relevant to the allegations in the Complaint, Groover was the manager and member of Defendants Borland-Groover Clinic, P.A. and BGC Holdings, Inc.; as well as Jax Anesthesia Providers, LLC and SouthPoint Anesthesia, LLC (collectively "Groover's Anesthesia Companies"); as well as several Ambulatory Surgery Centers listed below (Groover's ASCs), entities through which Groover extracted kickbacks for his anesthesia referrals and paid kickbacks to other physicians for their anesthesia referrals.

143.     Defendant BGC Holdings, Inc. ("BGC Holdings"), is a Florida corporation with its principal address as 4800 Belfort Road, Jacksonville, Florida 32256, which is controlled by Groover and directly and/or indirectly participates in the fraud at issue in this case.   BGC Holdings was reported to the State of Florida to be the manager of Southpoint Anesthesia.

144.   Defendant Borland-Groover Clinic, P.A. is a Florida Profit Corporation with its principal address as 4800 Belfort Road, Jacksonville, Florida 32256, which is controlled by Groover and directly and/or indirectly participates in the fraud at issue in this case.

145.   Defendant Jax Anesthesia Providers, LLC ("Jax") is a Florida Limited Liability Corporation located at 4800 Belfort Road, Jacksonville, Florida 32257, which is controlled by Groover and directly and/or indirectly participates in the fraud at issue in this case.

146.   Defendant Southpoint Anesthesia, LLC ("Southpoint Anesthesia") is a Florida Limited Liability Corporation located at 4800 Belfort Road, Jacksonville, Florida 32257, which is controlled by Groover and directly and/or indirectly participates in the fraud at issue in this case.

147.   Through his practice, Borland-Groover Clinic (BG), Groover is also an owner of Defendant Jax Anesthesia Providers, LLC and Defendant SouthPoint Anesthesia, LLC (collectively "Groover's Anesthesia Companies") through which he supplies anesthesia services to a number of ASCs in which Groover has and *shares ownership with other medical groups besides his own*; to wit, Fleming Island Surgery Center, LLC; SouthPoint Surgery Center, LLC; and Orange Park Surgery Center, Inc. ("non-BG ASCs"); as well as to a number of ASCs which are exclusively owned by Groover's own medical group Borland-Groover Clinic ("BG ASCs").

148.   Other owners of Jax Anesthesia Providers LLC are Robert S. Kanner (NPI# 1053313700), Lawrence Goldberg (NPI# 1699772483), Walter Harmon (NPI# 1972501633), and Bradford Joseph (NPI# 1831191337), none of whom are anesthesiologists.

149.   Jax Anesthesia supplies anesthesia services to non BG-ASCs Fleming Island and Orange Park Surgery Centers.

150.   Jax Anesthesia also supplies anesthesia services to a number of BG-ASCs.

151.    SouthPoint Anesthesia supplies anesthesia services to non-BG ASC SouthPoint Surgery Center.

152.    John Doe 1-1000 and Jane Doe 1-1000 are those other individuals and companies (including holding companies) which Groover has interposed in the scheme at issue in this case to receive referrals for anesthesia services and to pay kickbacks to the referrers of such anesthesia services.

153.    Groover and all the companies set forth herein as part of the Groover Ring are collectively referred to as "Groover."

The Referrers of Anesthesia Services and Recipients of Groover's Kickbacks

154.    Defendant Borland-Groover Clinic, P.A. ("Borland-Groover Clinic" or "BG") was partly owned by Groover and directly or indirectly through its physician owners referred anesthesia services to Groover's Anesthesia Companies and received directly or indirectly through its physician owners kickbacks for the anesthesia referrals.

155.    In addition to the owners of Borland-Groover Clinic, non-Borland Groover physician surgeons at the ASCs in question also referred anesthesia services to Groover in exchange for kickbacks.

156.    John Doe 1-1000 and Jane Doe 1-1000 are those other individuals and companies (including holding companies) which participated in the scheme by making referrals of anesthesia services to Groover and receiving kickbacks for such referrals.

The non-BG ASCs owned by Referrers where the Anesthesia Services are provided

157.    Orange Park Surgery Center, Inc. ("Orange ASC") is a Florida corporation with offices at 2050 Professional Center Drive, Orange Park, Florida 32073.  While it is listed as inactive by the Florida Department of State Corporations Divisions, its business operations are

ongoing.  At all times relevant to the allegations, Orange ASC was owned by multiple groups and physicians, besides Borland Groover Clinic, including but not limited to a general surgery group, an OBGYN group, an Urology group, an Orthopedic group, an Ophthalmology group, several plastic surgery groups, and others; and at all times relevant to the allegations was the situs of anesthesia services by Jax Anesthesia Providers, a Groover Anesthesia Company.

158.    Fleming Island Surgery Center, LLC ("Fleming Island ASC") is a Florida Limited Liability Company with offices at 1670-B Eagle Harbor Parkway, Orange Park, Florida 32003. At all times relevant to the allegations, Fleming Island ASC was owned by multiple groups and physicians, besides Borland Groover Clinic, including but not limited to a general surgery group, an OBGYN group, a Urology group, an Orthopedic group, an Ophthalmology group, several plastic surgery groups, and others; and at all times relevant to the allegations was the situs of anesthesia services by Jax Anesthesia Providers, LLC, a Groover Anesthesia Company.

159.    Southpoint Surgery Center, LLC ("Southpoint ASC") is a Florida Limited Liability Corporation with its offices at 7051 Southpoint Parkway, S., 1st Floor, Jacksonville, Florida 32216. At all times relevant to the allegations, Southpoint ASC was owned by multiple groups and physicians, besides Borland Groover Clinic, including but not limited to a general surgery group, an OBGYN group, an ENT group, an Ophthalmology group, a plastic surgery group, and others; and at all times relevant to the allegations was the situs of anesthesia services by Southpoint Anesthesia, LLC, a Groover Anesthesia Company.

160.    Defendant Borland-Groover Clinic has a number of exclusively owned ASCs throughout Florida, which are not at issue in this lawsuit *to the extent* anesthesia services provided there by the Groover anesthesia companies were provided by members of the Borland-Groover Clinic.

161.    Defendant Borland-Groover Clinic also has a number of *other non-exclusively owned ASCs throughout Florida* which require further identification as to their locations and anesthesia business arrangements.  At all times relevant to the allegations, they were the situs of anesthesia services by Groover Anesthesia Companies.

162.    John Doe 1-1000 and Jane Doe 1-1000 are those other individuals and ASCs (including holding companies) which participated in the scheme.

<u>Deployment of the Groover Ring in a Nutshell</u>

163.    Groover (independent of, but similar to Choudhry) is at the center of a scheme of kickbacks for anesthesia services referred by him and other ASC physician owners and referrers of anesthesia services in East Florida.

164.    Although Borland Groover Clinic is a large medical group, Groover has significant control over the management of the Borland Groover Clinic.

165.    Groover, a GI physician, acquired ownership and contractual interests, directly and/or through Borland-Groover Clinic and/or BGC Holdings in numerous ASCs, including ASCs that are exclusively owned by Borland-Groover Clinic, as well as ASCs that are not exclusively owned by Borland-Groover Clinic.

166.    Fleming Island ASC, Orange Park ASC, and SouthPoint ASC are not exclusively owned by Groover; they are owned by other physicians and medical groups who are neither GIs nor members of Groover's medical practice.

167.    Groover himself performed surgeries at Fleming Island ASC.

168.    Groover has management agreements to run the non-BG ASCs.

169.    According to numerous FSA members with extensive first hand interactions with Groover and other Borland-Groover Clinic physicians, Groover's anesthesia business model is to

approach the owners of underperforming ASCs with the offer to grow their *facility fees* by bringing his large group's (Borland Groover Clinic) surgical volume to the ASCs, as well as by creating an additional revenue stream – anesthesia fees - for the surgeon owners of the ASCs.

170.    This is the business model and pitch that Groover made at Fleming Island ASC, Orange Park ASC, and Southpoint ASC.

AACC and Orange Park and Fleming Island ASCs

171.    Groover, directly or through Borland-Groover Clinic, acquired an equity interest in Fleming Island ASC and Orange Park ASC in 2011, both struggling ASCs.

172.    Prior to Groover's acquiring partial ownership of Fleming Island and Orange Park ASCs, Fleming Island and Orange Park ASCs used independent anesthesia service providers, most commonly Anesthesia Associates of Clay County ("AACC").

173.    After Groover acquired partial ownership of Fleming Island and Orange Park ASC, Groover sought to convert AACC into a company model provider that would share its *anesthesia fees* with the ASC referrers/owners in exchange for receiving the anesthesia referrals from them.

174.    Though these discussions involved closed-door meetings between Groover and the owners of Fleming Island and Orange Park, including but not limited ophthalmologist Ernest Nicolitz, the subject of those meetings were discussed with other surgeon/s and administrator/s of the ASCs who reported to FSA Groover's overture to deploy company models at the ASCs through which he would share anesthesia revenue from such a model with the ASC/referrers.

175.    Consistent with the foregoing, the owners of Fleming Island and Orange Park notified AACC that they intended to go on company model with Groover and would be terminating AACC's contract within 60-days.

176.     In effect, AACC's contract was terminated at Fleming Island and Orange Park ASCs and was replaced a Groover Anesthesia Company; to wit, Jax Anesthesia.

177.     Initially, Jax Anesthesia was staffed and managed by Bodhi Tree, but was owned by Borland Groover.

178.     Although AACC was removed from Fleming Island and Orange Park ASCs, Groover hired an AACC anesthesiologist by the name of Mark Zepp as the contractor to oversee the Jax Anesthesia operations.

179.     After AACC's contract was terminated, Groover's company model Jax Anesthesia became the majority (if not exclusive) anesthesia service provider at Fleming Island and Orange Park ASCs.

180.     Since this lawsuit was filed, Groover has introduced a new Groover anesthesia company into Fleming Island by the name of Fleming Island Anesthesia, LLC.   Its business model is currently unknown.

181.     From the date that Jax Anesthesia began to provide anesthesia services at Fleming Island and Orange Park for non-BG surgeons who participated in the anesthesia revenues, every single referral by non-BG surgeons to Jax Anesthesia was tainted by kickbacks and billings for same constituted false claims.

182.     Jax Anesthesia anesthesiologists are not members of the Borland Groover Clinic. Yet BG surgeons received a share of their own referrals to Jax Anesthesia.  As such,every single referral by BG surgeons to Jax Anesthesia was tainted by kickbacks and billings for same constituted false claims.

<u>Groover paid Kickbacks to Non-BG referrers for at least one year</u>

37

183.    Groover induced the non-BG ASC owners of Fleming Island and Orange Park ASCs to terminate AACC and refer their anesthesia services to Jax Anesthesia by agreeing to and in fact kicking back a portion of the *anesthesia fees* generated by Jax Anesthesia from the ASC owner referrals.

184.    The kickbacks lasted at least one year or until 2013.

185.    After the first year, Groover suspended sharing the anesthesia revenues of Jax Anesthesia with non-BG surgeons.

186.    While the exact amount and mechanism for the funneling of the kickbacks back to the ASCs/referrers is uniquely within the knowledge of defendants, the payment of the kickbacks can reliably be inferred from the genesis of the relationships whereby the original anesthesia providers were terminated for not providing kickbacks and were replaced by the Groover company model anesthesia companies.

187.    Further, Relator knows that Groover paid kickbacks to non-BG referrers for at least one-year as a result of direct interactions between an FSA member and a Fleming Island and/or Orange Park non-BG ASC owner who readily admitted on multiple occasions that, in exchange for anesthesia referrals, Groover paid non-BG referrers a share of the anesthesia revenue of Jax Anesthesia.

188.    Relator further knows that Groover paid kickbacks to non-BG referrers for at least one-year as a result of direct interactions between an FSA member and a Fleming Island and/or Orange Park non-BG ASC owner who expressed outrage at the fact that Groover had persuaded the non-BG ASC owners to terminate the outside anesthesia provider in exchange for the anesthesia revenue, only to have Groover pull out from the arrangement one year later, while

continuing to share anesthesia revenue with his own partners, the Borland-Grover Clinic surgeons.

189.    Relator further knows that Groover paid kickbacks to the referrers for at least one-year as a result of direct interactions between an FSA member and a Fleming Island and/or Orange Park non-BG ASC owner who expressed that despite Groover discontinuing the payment of anesthesia revenue to the non-BG ASC owners, the non-BG ASC surgeons were now dependent on the Borland-Grover surgical volume so "they were letting Groover get away with reneging on their company model arrangement."

190.    One non-BG ASC owner referred to the value that Groover shared with the non-BG ASC surgeons as "bonuses" and expressed disappointment when BG "took bonuses away from the [non-BG] surgeons."

191.    One non-BG ASC owner expressed that the overall sentiment of the non-BG ASC owners was that they "were all suckered" in by Groover.

192.    INTENTIONALLY OMITTED

### Groover Paid Kickbacks to BG-Referrers since 2012 and to this Day

193.    Though Groover discontinued the payment of kickbacks to non-BG referrers, Groover continues to share with Borland Groover Clinic referrers the anesthesia  revenues for services provided (a) in *non-BG ASCs* for both (b) BG-referred cases, and (c) and non-BG referred cases.

194.    Relator knows this is the case because Borland Grover Clinic physicians have openly boasted to FSA members that they have been receiving anesthesia "stipends" all along, until this lawsuit stopped them from getting their "full" anesthesia stipend because the anesthesia revenue is being used instead toward legal fees.

195.    These Jax anesthesia revenues that have been and are being shared among Borland Grover physicians were generated by anesthesiologists who are not *members* of the Borland Groover Clinic.

196.    The sharing of such anesthesia revenues also constitute kickbacks to BG-surgeons for their anesthesia referrals.

<u>The Groover Defendants Knowingly Submitted False Claims to</u>
<u>Medicare for Jax Anesthesia</u>

197.    Since 2012 and to this day, Groover bills government payors for Jax anesthesia services through MED FIN (formerly Bodhi Tree).

198.    The billings for Jax Anesthesia were done by Med-FIN, a Bodhi Tree billing company.

199.    Jax Anesthesia has continuously held NPI number 1245271124.  However, Jax Anesthesia does not bill Medicare through its own NPI number.  Instead, it hires and contracts with anesthesiologists and CRNAs, who are required to assign to Jax Anesthesiology the right to bill through their individual NPI numbers as a condition of their ability to practice at the ASCs.

200.    In anticipation of or upon conversion of Fleming Island and Orange Park into company models in early 2012, Groover hired an AACC anesthesiologist by the name of Mark Zepp to oversee and direct Jax Anesthesia operations, with the intention of removing Bodhi Tree as the manager of anesthesia.

201.    Since then, Mark Zepp has directed anesthesia for Groover; however, the billing for anesthesia continues to be administered by Med-FIN.

202.    Further, Groover entered into contracts with additional anesthesiologists, including anesthesiologists Mary Jane Kohm and David Shapiro, as well as many CRNAs.

203.    All such anesthesiologists and CRNAs are compensated at rates significantly lower than what Groover's anesthesia companies bill and receive as *anesthesia fee*s from payors, such as Medicare.   As further detailed below, the difference is what Groover uses to pay kickbacks to the referrers, including himself.

204.    These additional anesthesiologists and CRNAs include Mary Jane Kohm, MD (NPI# 1972532752),   CRNA Russell Scott Avera (NPI#1730174814), CRNA Adam Boyd (NPI#1487622700), CRNA Patrick G. Bailey (NPI#1316920333), and CRNA Eric Seybolt (NPI#1295894384).

205.    In 2014 alone, Jax submitted bills to Medicare for anesthesia services for these anesthesiologists and CRNAs as follows: Kohm ($296,064 in charges for 546 beneficiaries), Avera ($167,976 in charges for 322 beneficiaries), Boyd ($266,038.00 in charges for 527 beneficiaries), Bailey ($340,343.00 in charges for 618 beneficiaries), and Seybolt ($318,756.40 in charges for 765 beneficiaries).   These are but a sample of all the claims submitted by Jax since 2012.

206.    Jax's actual billings to Medicare are the aggregate billings of all individual anesthesiologists and CRNAs that practice through Jax at the Groover ASCs.   Collectively, they exceed millions of dollars annually.

NFAC and Southpoint ASC

207.    As with Fleming Island and Orange Park ASCs, prior to Groover acquiring partial ownership of Southpoint ASC, Southpoint ASC used a legitimate outside anesthesia service provider by the name of North Florida Anesthesia Consultants ("NFAC").

208.    After Groover acquired partial ownership of Southpoint ASC in early 2012, NFAC, aware of Groover's deployment of a company model at Fleming Island and Orange Park

ASCs, feared that Groover had the same plans for NFAC; to wit, to turn it into a company model provider in order to demand a share of their anesthesia revenues in exchange for anesthesia referrals.

209.    NFAC was not interested in paying kickbacks for anesthesia referrals.

210.    Groover terminated NFAC's anesthesia contract and replaced NFAC with a Groover Anesthesia Company; to wit, Southpoint Anesthesia (which, like Jax Anesthesia, initially was staffed and managed by Bodhi Tree).

211.    Upon information and belief, Groover induced the non-BG ASC owners of Southpoint ASC to terminate NFAC and refer their anesthesia services to Southpoint Anesthesia by agreeing to and in fact kicking back a portion of the *anesthesia fees* generated by Southpoint Anesthesia to the ASC owner/referrers.

212.    Although Southpoint non-BG surgeons and Groover always met behind closed doors and the exact mechanism by which kickbacks were funneled back to the non-BG owner/referrers of anesthesia, the information and belief is based on reports to Relator by an insider of Southpoint ASC who, based on discussions about the Groover "take-over" with key non-BG ASC owners, reported that the impetus of the Groover anesthesia arrangement was to make money on anesthesia and that Groover would let the non-BG ASC surgeons keep some of the anesthesia revenue.

213.    Also reported by an insider of Southpoint AC was that the foregoing was consistent with Groover's business model and reputation in the medical community of "dangling" the Borland Groover Clinic surgical volume to get inside under-performing ASCs, ultimately take them over with the expectation that all existing employees of the ASC would be

retained through the transition, and then replaced with "Groover people" who would not question Groover's operations, anesthesia or otherwise.

214.    Consistent with the company model company Groover created, Southpoint Anesthesia became the exclusive anesthesia service provider at Southpoint since early 2012.

215.    From the date that Southpoint Anesthesia began to provide anesthesia services at Southpoint ASC for non-BG surgeons who participated in the anesthesia revenues, every single referral by non-BG surgeons to Southpoint Anesthesia was tainted by kickbacks and billings for same constituted false claims.

216.    Further, Southpoint Anesthesia anesthesiologists are not members of the Borland Groover Clinic and, thus, are not allowed to provide remuneration to Borland Clinic physicians for their anesthesia referrals.   Yet, BG surgeons received a share of the anesthesia revenue generated by both their anesthesia referrals, as well as the anesthesia referrals from non-BG surgeons.   Therefore, just as every single anesthesia referral by non-BG surgeons are tainted by kickbacks, every single anesthesia referral by BG surgeons to Southpoint Anesthesia was tainted by kickbacks and billings for same constituted false claims.

217.    INTENTIONALLY OMITTED

218.    To this day, Groover continues to share with Borland Groover Clinic physicians the Southpoint anesthesia revenue for services provided at Southpoint ASC, a *non-BG ASC,* in cases referred by medical groups *other than* Borland Groover Clinic, as well as cases referred by Borland-Grover Clinic physicians.

219.    Relator has information and belief of the foregoing because Borland Grover Clinic physicians have openly boasted to FSA members that they were receiving anesthesia

"stipends" all along and that this lawsuit has stopped them from getting their "full" anesthesia stipend, also stating that "it's the price of doing business."

<u>The Groover Defendants Knowingly Submitted False Claims to</u>
<u>Medicare for Southpoint Anesthesia</u>

220.    Since 2012 and to this day, Groover has billed government payors for Southpoint Anesthesia services through MED FIN (formerly Bodhi Tree).

221.    Southpoint Anesthesia has continuously held NPI number 1457610172 (received from CMS on or about May 15, 2012).  However, Southpoint Anesthesiology does not directly bill Medicare or Medicaid under that NPI number.   Instead, it hires and contracts with anesthesiologists and CRNAs who are required to assign to Southpoint Anesthesia the right to bill under their individual NPI numbers as a condition of their ability to practice at the ASCs.

222.    Specifically, upon conversion to a company model anesthesia company in early 2012, Groover engaged a Bodhi Tree contractor previously providing locum tenens services at Fleming Park Surgery Center by the name of Marc Notrica to oversee Southpoint Anesthesia.

223.    Groover also engaged multiple CRNAs to provide anesthesia services under Notrica's oversight.

224.    Notrica was replaced at the end of 2012 with Tiffany King, also a former AACC anesthesiologist and Mark Zepps's wife.

225.    Southpoint Anesthesia billings to Medicare from 2012 to this date are the aggregate billings of the anesthesiologists and CRNAs that practice through Southpoint Anesthesia. These aggregate billings through their individual NPI numbers are in the millions of dollars annually.

226.    For example, in 2014 alone, Tiffani King, MD (NPI# 1750383378) billed $36,104.27 for 42 Medicare beneficiaries; Mark Zapp (NPI# 1083616577) billed $22,857.28 for

101 Medicare beneficiaries; and David Shapiro (NPI# 1760452452) billed $14,680.17 for 29 Medicare beneficiaries. These numbers do not include the thousands of procedures in which CRNAs provided anesthesia services through Southpoint Anesthesia under the supervision of the foregoing anesthesiologists.

227.     Grover paid Notrica and the CRNAs significantly less than the *anesthesia fees* Grover received from Medicare for their anesthesia services and shared the anesthesia revenue with the referrers of anesthesia cases.  The difference is what Groover uses to pay kickbacks to the referrers, including himself.

<u>The Kickback Scheme led to Over-Utilization of Anesthesia at Groover's ASCs</u>

228.     With the adoption of the company model which unlawfully allowed referring physicians, both BG and non-BG, to profit from anesthesia services provided by third parties, the incentive to over-refer (over-utilize) anesthesia services followed.

229.     Physician referrers/owners sought to maximize those kickbacks by substantially increasing the frequency with which anesthesia was rendered to patients.

230.     Relator has reports that cases which did not need anesthesia received anesthesia anyway without a commensurate increase in patient care; to wit:

> a.   Surgeons started to bend exclusions in order to use anesthesia on everyone.
>
> b.   There were times when the anesthesiologist/s tried to cancel cases because the patient was unstable or had a cardiac condition, but the surgeons were dismissive of the anesthesiologist/s, offering sentiments like "it's just a local" or "it's just a short procedure."
>
> c.   The high volume caused medical errors and patient harm.  In one instance, the wrong eye was operated in a patient; in another instance a GI patient coded.
>
> d.   The revenue stream caused fly-by surgeries to explode without a commensurate increase in patient care.  Surgeons flew in, did their surgeries, and left, often while their patients were still under anesthesia at the ASC.  This was extremely uncomfortable to the anesthesiologist/s and was not the standard of care.

231.    In sum, just as with Choudhry, the adoption of the Groover company model scheme in the Groover ASCs resulted in the overutilization of anesthesia, as well as potential and actual harm to patients.

Conclusion regarding Groover Ring

232.    In conclusion, beginning in 2012 and lasting to this day, Groover deployed a company model scheme where one purpose (if not the sole purpose) was to extract kickbacks for referrals from anesthesiologists and for the purpose of inducing others to refer anesthesia services to him/his companies in exchange for a kickback on those referrals.

233.    The Groover Defendants knowingly participated in the kickback shceme.

234.    The kickbacks tainted all billings for anesthesia services to Medicare and other government payors from no later than 2012 forward.  It also tainted other professional and facility billings for surgeries which were performed in those facilities in order to access Groover's kickback system.

235.    The Groover Defendants submitted bills and caused bills to be submitted that were false claims for which they are jointly and severally liable.

236.    Since 2012 and to this day, Groover billed government payors for Southpoint anesthesia services through MED FIN (formerly Bodhi Tree).

OIG Advisory Opinion No. 12-06

237.    Analogous practices to those described in this Complaint triggered an advisory opinion by the Office of Inspector General in June of 2012.  See OIG Advisory Opinion No. 12-06, Proposal B, attached as Exhibit 4.  Virtually everyone in the anesthesia world was aware in 2012, Defendants included, of this OIG Opinion.

238.     In that opinion, the OIG addressed an arrangement where the owners of the ASC (the referrers of anesthesia patients) were also the owners of the entity providing the anesthesia services in the ASC (just as is the case with the Choudhry anesthesia companies and the Groover anesthesia companies).

239.     The anesthesia company was run by an anesthesiologist who charged the ASC a flat rate for anesthesia services pursuant to a contract with the ASC.  Here, the company model anesthesiologists charge a flat rate to the company model anesthesia companies and, thereafter, the company model provider (Choudhry's or Groover's anesthesia companies, or some related entity) then charges a flat rate to the ASC.  This is a distinction without a difference so long as the flat rate charged by the anesthesia contractor is below the *anesthesia fee* that the company model provider receives from Medicare or some other payor; the spread between the Medicare anesthesia payment and the payment to the anesthesia contractor is the Delta from which the kickback to the referrers is paid.

240.     In the arrangement reviewed by the OIG, the owners of the ASC (the referrers of anesthesia cases) retained the "profits" from the operations of the anesthesia entity after it paid out the anesthesiologist (the Delta).  In this remuneration for the referrals to the referrers lies the "company model."

241.     The OIG noted that under this arrangement, the owners of the ASC refers patients to the anesthesiology company and, as owners of the anesthesia company, also derive profits from those referrals.  Minus some permutations and layers of companies interposed in the value transfers, this is exactly how the Choudhry and Groover respective rings function.

242.     To wit, in exchange for the anesthesia referrals, the company model owners, Choudhry and Groover, who also happen to be the ASC owners and the referrers of anesthesia

services, extract a kick back for the referrals to the anesthesia company under the guise of "profit". Further, having taken their company model "on the road" to other ASC owners/referrers, Choudhry and Groover also reward the referrals by those third parties through the payment of kickbacks.

243. In that opinion, the OIG stated that it has "long been concerned about the potential for investments in ASCs to serve as vehicles to reward referrals."

244. Further, the OIG found that no exceptions (known as safe harbors) would apply to the profits the physician owners were receiving from the anesthesia services.

245. Therefore, the OIG concluded that the use of the company model created a significant risk for illegal kickbacks in violation of the AKS.

246. In sum, consistent with the OIG opinion, because one purpose of the remuneration to referrers in this case is to induce referrals for services reimbursed by federal and state programs, the remuneration is a kickback under AKS and the basis for FCA liability.

## CONCLUSION

247. The Company Model has evolved since the 2012 OIG advisory opinion and comes in a number of factual permutations, including those present in this case. In all such permutations, however, a referrer of anesthesia patients receives remuneration (value) for the anesthesia services referred, whether or not the referrer owns the anesthesia company or the ASC. If one purpose of the value that is conveyed is to induce and reward referrals, as is the case here, that is an unlawful kickback.

248. Here, the Choudhry and Groover Defendants, directly, indirectly, and/or through the respective entities they controlled, abused their position as specialist/surgeon/ASC owners

with a captive patient base to demand from independent anesthesia providers kickbacks for anesthesia referrals.

249.    When the demand for kickbacks was not heeded, they terminated those anesthesia providers and set up their own company model anesthesia companies to secure and provide the kickbacks for their own referrals.

250.    As if that were not enough, they then took the company model anesthesia companies on the "road" and began to give kickbacks to other surgeon/ASC owners from other medical groups for *their* anesthesia referrals.

251.    Defendants billed government programs for the services tainted by kickbacks, primarily anesthesia services, but secondarily facility fees and professional fees for surgeries that were conducted in the ASCs served by the Defendants for the purpose of taking advantage of the kickback arrangements.

252.    Defendants' actions were knowing and/or reckless, as defined by the FCA.

253.    Defendants acted in concert with one another to violate the FCA.

### **COUNT I – Choudhry Defendants**

#### False Claims Act - False Claims

254.    Relator realleges and incorporates paragraphs 1–52, 53-139, and 237-253 of this Complaint as if fully set forth herein.

255.    In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers and agents knowingly and/or recklessly presented or caused to be presented false or fraudulent claims for payment or approval for payment by government funds in violation of 31 U.S.C. § 3729(a)(1)(A).

256.     The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## COUNT II – Choudhry Defendants

### False Claims Act - False Statements

257.     Relator realleges and incorporates paragraphs 1–52, 53-139, and 237-253 of this Complaint as if fully set forth herein.

258.     In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record of statement to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(1)(B).

259.     The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT III – Choudhry Defendants

### Florida Medicaid False Claims Act - False Claims

260.     Relator realleges and incorporates paragraphs 1–52, 53-139, and 237-253 of this Complaint as if fully set forth herein.

261.     In performing the acts described above, Defendants, acting in concert and/or through their own actions or through the acts of their officers and/or agents, knowingly presented, or caused to be presented, to an officer or employee of the State of Florida, a false claim under the Florida Medicaid False Claims Act in violation of Fla. Stat. ch. 68.081 et seq.

## COUNT IV – Groover Defendants

### False Claims Act - False Claims

262.    Relator realleges and incorporates paragraphs 1-52, 140-236, and 237-253 of this Complaint as if fully set forth herein.

263.    In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers and agents knowingly and/or recklessly presented or caused to be presented false or fraudulent claims for payment or approval for payment by government funds in violation of 31 U.S.C. § 3729(a)(1)(A).

264.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments, which resulted in its being damaged in an amount to be determined.

## <u>COUNT V – Groover Defendants</u>

<u>False Claims Act - False Statements</u>

265.    Relator realleges and incorporates paragraphs 1-52, 140-236, and 237-253 of this Complaint as if fully set forth herein.

266.    In performing the acts described above, Defendants, acting in concert and/or through their own acts or through the acts of their officers, knowingly made, used or caused to be made or used, a false record of statement to get false or fraudulent claims paid or approved by the Government in violation of 31 U.S.C. §3729(a)(1)(B).

267.    The United States, unaware of the foregoing circumstances and conduct of the Defendants, made full payments which resulted in its being damaged in an amount to be determined.

## COUNT IV – Groover Defendants

### Florida Medicaid False Claims Act - False Claims

268.     Relator realleges and incorporates paragraphs 1-52, 140-236, and 237-253  of this Complaint as if fully set forth herein.

269.     In performing the acts described above, Defendants, acting in concert and/or through their own actions or through the acts of their officers and/or agents, knowingly presented, or caused to be presented, to an officer or employee of the State of Florida, a false claim under the Florida Medicaid False Claims Act in violation of Fla. Stat. ch. 68.081 et seq.

## PRAYER FOR RELIEF

*WHEREFORE*, Relator respectfully requests that this Court enter judgment against Defendants as follows:

a.  That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged in this Complaint, as the Civil False Claims Act, 31 U.S.C. § 3729 et seq. provides;

b.  That civil penalties of $5,500 to $11,000 (and to the extent increased by statute, any such increased amount) be imposed for each and every false claim that the Defendants caused to be presented and/or payment the Defendants wrongfully avoided paying to the United States;

c.  That pre- and post-judgment interest is awarded, along with reasonable attorneys' fees, costs, and expenses which Relator necessarily incurred in bringing and pressing this case;

d.  That Relator be awarded the maximum amount allowed pursuant to the False Claims Act;

e.  That the State of Florida be awarded damages in the amount of three times the damages sustained by the State of Florida because of the false claims alleged in this Complaint, as the Florida Medicaid False Claims Act provides;

f.  That civil penalties of $5,500 to $11,000 000 (and to the extent increased by statute, any such increased amount) be imposed for each and every false claim that the Defendants caused to be presented to the State of Florida Medicaid Program;

g.  That necessary expenses, costs, and reasonable attorney's fees be awarded as provided by the Florida Medicaid False Claims Act;

h.  That Relator be awarded the maximum amount allowed pursuant to the Florida Medicaid False Claims Act; and,

i.  That this Court award such other and further general, equitable, and legal relief as it deems just and proper.

## **DEMAND FOR A JURY TRIAL**

Relators demand a jury trial on all claims alleged herein.

Respectfully submitted,

s/ J. Marc Vezina

**VEZINA LAW GROUP**
Monica P. Navarro - P52985
J. Marc Vezina - P76232
280 N. Old Woodward Ave, Suite LL20
Birmingham, MI 48009
(248) 558-2700
(248) 232-1581
mnavarro@vezinalaw.com
jmv@vezinalaw.com

/s Christopher Casper

**JAMES HOYER, P.A.**
Christopher Casper FBN: 048320
4830 W. Kennedy Blvd., Suite 550
Tampa, FL 33609

Phone: (813) 397-2300
Fax: (813) 397-2310
ccasper@jameshoyer.com


**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Third Amended Complaint was electronically filed on

October 25, 2016, and will be served on counsel of record via CM/ECF electronic service.

      /s Christopher Casper