## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF FLORIDA, *ex rel.* FLORIDA SOCIETY OF ANESTHESIOLOGISTS, | CIVIL ACTION |
| | Case No. 8:13-cv-2603-T-27AEP |
| Plaintiffs, | |
| v. | **DISPOSITIVE MOTION** |
| UMESH CHOUDHRY, et al., | |
| Defendants. | |

### DEFENDANTS JAX ANESTHESIA PROVIDERS, LLC, SOUTHPOINT ANESTHESIA, LLC, BORLAND-GROOVER CLINIC, P.A. AND BGC HOLDINGS, INC.'S DISPOSITIVE MOTION TO DISMISS

Jax Anesthesia Providers, LLC ("Jax"), Southpoint Anesthesia, LLC ("Southpoint"), Borland-Groover Clinic, P.A. ("BGC"), and BGC Holdings, Inc. ("BGC Holdings") (collectively, the "BGC Defendants"), by and through their undersigned counsel, and pursuant to Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure, move to dismiss the Third Amended False Claims Act Complaint ("TAC") (Dkt. 110) filed by Relator, the Florida Society of Anesthesiologists (the "Society") with prejudice to Relator and its members.

### PRELIMINARY STATEMENT

On October 11, 2016, the Court dismissed the Society's Second Amended Complaint ("SAC") for failure to state a claim. Dkt. 108. As to the BGC-affiliated defendants, the Court found that the SAC suffered from two dispositive "deficiencies." *Id.* at 3-5. First, the Court observed that the SAC alleged that one BGC defendant "owned or co-owned two anesthesia service companies . . . and that he 'used his reputation and large practice' to obtain contracts for his anesthesia service companies with a number of ambulatory surgery centers," and held that in doing so the Society had "only described [the scheme] in broad, general terms, without the

particularity required by Rule 9(b)." *Id.* at 4. Second, the Court found that "the Second Amended Complaint is . . . devoid of <u>any</u> factual allegations supporting a violation of the FCA or FFCA by [the BGC Defendants]," describing "in conclusory fashion a referral kickback scheme" and "summarily" concluding that the "Defendants violated the FCA and FFCA." *Id.* at 5 (emphasis in original) (quotation omitted).

On October 25, 2016, the Society filed the TAC. While the TAC does have more paragraphs dedicated to the BGC Defendants, those paragraphs do not remedy the deficiencies outlined in the Court's October 11 order. In the end, the TAC confirms that, as to the BGC Defendants, the Society alleges nothing more than the possibility of a scheme, in broad and general terms. The TAC fails to plead fraud with particularity, as required by Fed. R. Civ. P. 9(b), or to plainly set forth a claim for violations of the False Claims Act ("FCA") or the Florida False Claims Act ("FFCA"), as required by Fed. R. Civ. P. 8.

Nothing in the TAC suggests that any of the Society's members has personal knowledge of the billing practices or submission of claims by any defendant. The Society's allegations against the BGC Defendants consist of nothing more than (1) descriptions of ownership and contractual relationships involving the BGC Defendants and Dr. Jack Groover, (2) rumors purportedly passed among or overheard by its members, most of whom remain nameless, about comments of others purportedly made in meetings that none of them attended, and (3) summaries of publicly available information indicating that BGC-affiliated anesthesiologists received payments from Medicare in 2014. From these "facts," the Society leaps to the conclusion that the BGC Defendants engaged in a fraudulent scheme to pay kickbacks to referring surgeons from within and without their organization, that the scheme involved thousands of unidentified Jane and John Doe actors, that it continued from 2012 to 2016, and that it resulted not only in claims to

Medicare, but to Florida Medicaid as well. *See* TAC ¶¶ 140, *et seq*. These allegations are a far cry from particularity: the TAC does not plead underlying violations of the AKS or Stark Law and does not identify any allegedly false claim or false statement. And, having not identified any false claims or false statements to begin with, the TAC also obviously does not show that any false claims were submitted by any entity, to any program.

The TAC alleges that the Society's kickback allegations are of a special sort that frees the Society of the requirement the Eleventh Circuit Court of Appeals normally imposes on a *qui tam* relator of identifying false claims with specificity. Relator claims this special rule applies to allegations that kickbacks taint every claim submitted for the services of an anesthesiologist working with a BGC-affiliated anesthesiology group. *See* TAC ¶ 44. That premise, even if valid, makes it incumbent on a relator to do something the Society hasn't – plead with particularity underlying violations of the AKS that actually resulted in the submission of false claims. Instead, the TAC continues to allege only that BGC business structures bear a resemblance to one that a government agency opined "*could* [i.e. possibly] constitute an illegal inducement under the [AKS]," Dkt. 108 at 4, n.5 (quoting OIG-HHS Advisory Opinion No. 12-06 at 84), and to rely on rumor and unfounded surmise about the movement of funds within BGC-affiliated entities.

By relying only on general and conclusory allegations and an analogy to what "could" violate the AKS, the TAC "stops short of the line between possibility and plausibility of 'entitlement to relief,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and in so doing, fails to correct the deficiencies identified in this Court's prior order. *See* Dkt. 108; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The TAC is in fact more notable for what it leaves out than for the introduction of any new specific plausible theory of liability. The TAC doesn't identify any actual referral from a surgeon. *See* TAC ¶¶ 181, 182 (alleging "every single referral"

3

to Jax Anesthesia made by unnamed surgeons "was tainted by kickbacks"). It doesn't identify any payment, or even the form of any payment, from an anesthesiologist or anesthesia group to a surgeon. *See* TAC ¶¶ 181, 182 (alleging generally that "participat[ion] in anesthesia revenues" and "receipt of a share of their own referrals to Jax Anesthesia" is a kickback); 212 (alleging that the "impetus for the arrangement was to make money on anesthesia and that Groover would let the non-BG ASC surgeons keep some of the anesthesia revenue"). And it does not plausibly allege that any participant engaged in these transactions knowing that doing so was illegal.

Moreover, even if the Society's kickback allegations did cross that threshold, the TAC's reliance on publicly available data reflecting total annual *Medicare* payments in one calendar year to certain anesthesia providers for unspecified services[1] is not sufficient to meet the requirements of the Eleventh Circuit's seminal ruling in *United States ex rel. Clausen v. Laboratory Corp.* 290 F.3d 1301 (11th Cir. 2002). The TAC admits by omission that the Society lacks personal knowledge of any Medicare or Medicaid claims submitted in violation of the FCA or the FFCA as a result of any alleged kickback, asserting simply that such claims *must have been* the result. TAC ¶¶ 43, 235. And, the Society doesn't offer any allegation about referrals, claims, or payments from other Federal Health Care Program, including, importantly, *Florida Medicaid.* At a minimum, this clear deficiency mandates dismissal of the Society's FFCA claims.

Since none of the Society's general, speculative allegations satisfy the applicable standards, the TAC should be dismissed with prejudice to the Society and its members.

---

[1] *See* Centers for Medicare and Medicaid Service, *Medicare Physician and Other Supplier National Provider Identifier (NPI) Aggregate Report, Calendar Year 2014*, https://data.cms.gov/Public-Use-Files/Medicare-Provider-Utilization-and-Payment-Data-Phy/ee7f-sh97 (last visited Dec. 13, 2016); *id.*, https://data.cms.gov/Public-Use-Files/Medicare-Physician-and-Other-Supplier-National-Pro/4a3h-46r6 (last visited December 13, 2016).

## STATUTORY FRAMEWORK

### A. The False Claims Act and the Florida False Claims Act.

The FCA allows a private citizen to file suit in the name of, and pursue claims on behalf of, the United States. 31 U.S.C. § 3730(b). The FCA prohibits submitting, or causing to be submitted, false or fraudulent claims to the government. 31 U.S.C. § 3729(a)(1)(A). It further prohibits making, using, or causing to be made or used, a false record or statement "material to a false or fraudulent claim" under its "false statements" provision. *Id.* § 3729(a)(1)(B).

The elements of the violation alleged in Count IV are (1) a false or fraudulent claim, (2) which the defendant presented or caused to be presented for payment by the United States, (3) with knowledge that the claim was false. 31 U.S.C. § 3729(a)(1)(A); *see United States v. KForce Gov't Sols., Inc.*, No. 8:13-CV-1517-T-36TBM, 2014 WL 5823460, at *7 (M.D. Fla. Nov. 10, 2014).

The elements of the violation alleged in Count V are (1) a false statement or record made by the defendant, (2) that was material to payment of a false or fraudulent claim, and (3) that the defendant knew was false. 31 U.S.C. § 3729(a)(1)(B); *United States ex rel. Mastej v. Health Mgmt. Associates, Inc.*, 591 F. App'x 693, 711 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 2379 (2015). And, the Eleventh Circuit has found that the false statements provision requires that "a plaintiff must prove that the government in fact paid a false claim." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1329 (11th Cir. 2009).

The FFCA cause of action alleged in Count VI (mislabeled Count IV in the TAC) is in accord. *See United States ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1033 n.5 (S.D. Fla. 2007); *see also Barys ex rel. United States v. Vitas Healthcare Corp.*, 298 F. App'x 893, 894 n.1 (11th Cir. 2008).

The statutes define "knowledge" to include "actual knowledge of the information," "deliberate ignorance," or "reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1) (2009); *United States ex rel. Crenshaw v. Degayner*, 622 F. Supp. 2d 1258, 1270 (M.D. Fla. 2008); *Clausen*, 290 F.3d at 1309 n. 12.

### B. Anti-Kickback Statute

The AKS forbids "knowingly and willfully" soliciting, receiving, offering, or paying remuneration in return for or to induce referring "an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. §§ 1320a-7b(b)(1)(A); (b)(2)(A); *see United States v. Vernon*, 723 F.3d 1234, 1251 (11th Cir. 2013). While broad, it contains numerous exceptions and safe harbors. 42 U.S.C. § 1320a-7b(b)(3)(B); 42 C.F.R. § 1001.952.

For purposes of the FCA, the AKS provides that claims "resulting from" a violation of the AKS are false. *Id.* § 1320a-7b(g); *See also Barker ex rel. United States v. Columbus Reg'l Healthcare Sys., Inc.*, 977 F. Supp. 2d 1341, 1344 (M.D. Ga. 2013) ("Claims submitted that include items or services resulting from kickback violations may be deemed 'false' under the [FCA].").

### C. Ethics in Patient Referrals Act (a/k/a "Stark Law")

In contrast to the more general AKS, the prohibitions of the Stark Law apply only to referrals for certain "Designated Health Services" ("DHS") made to a certain type of "entity" (a "DHS Entity") with which a physician has a "financial relationship," unless a statutory or regulatory exception applies. *See* 42 U.S.C. § 1395nn(a)(1)(A). The statute prohibits the DHS Entity from billing Medicare for DHS provided as a result of a prohibited referral. *Id.* §

1395nn(a)(1)(B). Anesthesia services are not DHS; ASC services are explicitly excluded from the DHS definition. *See* 42 CFR 411.351.

## PLEADING STANDARD

### A. Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Rule 12(b)(6) requires dismissal if a complaint fails to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the complaint must "plead sufficient *facts* to state a claim to relief that is 'plausible on its face.'" *Iqbal*, 556 U.S. at 678 (emphasis added). The allegations in a complaint must "possess enough heft to 'sho[w] that the pleader is entitled to relief,'" and must cross over the line from "possibility" to "plausibility." *Twombly*, 550 U.S. at 545; *see also Iqbal*, 556 U.S. at 679 ("A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."). This requires pleading "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678; *see also* Dkt. 108 at 2 ("The complaint must 'plead all facts establishing an entitlement to relief with more than labels and conclusions or a formulaic recitation of the elements of a cause of action.'") (citation and internal quotation omitted).

Analyzing a complaint under the plausibility standard of Rules 8 and 12(b)(6), courts first identify and disregard any "bald assertions" and "legal conclusion couched as a factual allegation" in the complaint. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 n.8 (3d Cir. 1997). And although a district court must "accept all factual allegations in the complaint as true," it will "not apply this rule to legal conclusions." *Anthony v. Am. Gen. Fin. Servs., Inc.,* 626 F.3d 1318, 1321 (11th Cir. 2010) (citing *Iqbal*). To the contrary, "conclusory allegations, unwarranted factual deductions or legal

conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003). Only after conclusory matter is stripped away can the court "draw on its judicial experience and common sense" to determine if a complaint states a "plausible claim for relief." *Iqbal*, 556 U.S. at 679. If the complaint's remaining, non-conclusory factual content "stops short of the line between possibility and plausibility of 'entitlement to relief,'" it fails to state a claim. *Id.* at 678 (quoting *Twombly*).

### B. Rule 9(b) of the Federal Rules of Civil Procedure.

Claims for violation of the FCA or FFCA must satisfy a heightened pleading burden under Rule 9(b) and plausibly plead fraud with particularity. *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2004 n.6 (2016) ("And False Claims Act Plaintiffs must also plead their claims with plausibility and particularity under Federal Rules of Civil Procedure 8 and 9(b) by, for instance, pleading facts to support allegations of materiality."); *Clausen*, 290 F.3d at 1310-11; *see also United States ex rel. Schubert v. All Children's Health Sys., Inc.*, No. 8:11-cv-1687-T-27EAJ, 2013 WL 1651811, at \*2 (M.D. Fla. Apr. 16, 2013); *see also* Dkt. 108 at 2 ("The particularity requirement of Rule 9(b) is satisfied if the complaint alleges 'facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them.'") (quoting *Hopper*).

To "state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), Relators must "plead facts as to the *time, place, and substance* of the defendant's alleged fraud, specifically the details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." *Clausen*, 290 F.3d at 1310 (quotation omitted) (emphasis added). Rule 9(b) protects defendants "against spurious charges of immoral and fraudulent behavior" and

"from harm to their goodwill and reputation." *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (quotations omitted). Rule 9(b) also protects defendants facing inadequately pled claims from the burdens of discovery. *See D.H.G. Props., v. Ginn Cos.*, No. 3:09-CV-735-J-34JRK, 2010 WL 5584464, at *7 (M.D. Fla. Sept. 28, 2010).

For an FCA claim, just as for any other fraud claim governed by Rule 9(b), a party must plead specific details identifying the "who," "what," "where," "when," and "how" of alleged fraud. *See Hopper*, 588 F.3d at 1327. As the Eleventh Circuit has explained, Rule 9(b) does "not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government. . . . [S]ome indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Clausen*, 290 F.3d at 1311; *see also* Dkt. 108 at 3. That is because the FCA "does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *Clausen*, 290 F.3d at 1311.

## ARGUMENT

### I. THE TAC FAILS TO STATE A CLAIM UNDER THE FCA WITH PLAUSIBILITY AND PARTICULARITY.

#### A. The TAC fails to plead the submission of any false claim to Medicare or the making of any false statement material to that claim with requisite particularity.

Dismissal of FCA claims for failure to comply with Rule 9(b) is warranted when a relator, like the Society, fails to plead the submission of any actual false claims. *United States ex rel. Van Raalte v. Healogics, Inc.*, No. 614-cv-283-Orl-31KRS, 2016 WL 2744949, at *5 (M.D. Fla. May 11, 2016) ("It is not enough for the plaintiff-relator to state baldly that he was aware of

the defendants' billing practices, to base his knowledge on rumors, or to offer only conjecture about the source of his knowledge.") (internal citations omitted, citing 11th Circuit precedent); *see also* Dkt. 108 at 3 (finding that Rule 9(b) does not permit a relator to "merely describe a private scheme in detail but then allege simply… that claims requesting illegal payments must have been submitted") (quoting *Clausen*, 290 F.3d at 1311) (internal quotation omitted). Submission of a false claim to the government is "the *sine qua non* of a False Claims Act violation," *Clausen*, 290 F.3d at 1311 (affirming dismissal under Rule 9(b) for failure to plead the submission of any claims); *Van Raalte*, 2016 WL 2744949, at \*5 (dismissing FCA claims under Rule 9(b) for failure to plead the submission of false claims); *United States ex rel. Westfall v. Axiom Worldwide, Inc.*, No. 8:06-CV-571-T-33TBM, 2009 WL 1424213, at \*4 (M.D. Fla. May 20, 2009) (same). And, in this case, this Court has observed that "[t]he central question in any False Claims Act case is whether the defendant ever presented a false or fraudulent claim to the government." Dkt. 108 at 3 (internal quotations omitted) (quoting Hopper, 588 F.3d at 1326). Without allegations that any particular claims were false, and that those claims were submitted to the government for payment, the Society's TAC is deficiently pled.

At its most detailed, the TAC generally avers that bills were submitted to Medicare for anesthesia services for three anesthesiologists and four CRNAs in one year, 2014. TAC ¶¶ 205, 226. The TAC itself demonstrates the insufficiency of these general allegations. The TAC curiously states that a subset of the very claims described in those paragraphs are *not* claims "tainted by kickbacks" at issue: "The kickbacks [to non-BG physicians] lasted at least one year or until 2013." TAC ¶ 184. Like relator Clausen, the Society simply alleges that some anesthesiologists and CRNAs received payments from Medicare in 2014, without segregating claims, if any, that resulted from kickbacks from those that resulted from referrals from

physicians who were no longer receiving – or had never received – kickbacks. *Id.* By any standard, Relators have not pled an FCA violation.

The allegations do not come close to satisfying Rule 9(b). The TAC does not identify "the particular *document and statement* alleged to be false, *who* made or used it, *when* the statement was made, *how* the statement was false, and *what* the defendants obtained as a result." *United States ex rel. Matheny v. Medco Health Solutions, Inc.,* 671 F.3d 1217, 1225 (11th Cir. 2012) (emphases added); *see also United States ex rel. Childress v. Ocala Heart Inst., Inc.,* No. 5:13-cv-470-Oc-22PRL, 2015 WL 10742765, at *1 (M.D. Fla. Nov. 23, 2015) (dismissing FCA case that "contains more sweeping generalizations and legal conclusions[] than it does particularized facts"). As in *Clausen,* "nowhere in the blur of facts . . . assembled by [the relator] regarding [the alleged] schemes can one find any allegation, stated with particularity, of a false claim actually being submitted to the Government." *Clausen,* 290 F.3d at 1312 (rejecting "conclusory statement tacked on to each allegation that bills were submitted to the Government as a result of these schemes"). It is not enough "to merely describe a private scheme in detail but then to allege simply and without stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted, or should have been submitted to the Government." Dkt. 108 at 3 (internal quotation omitted) (quoting *Clausen,* 290 F.3d at 1311).

In the absence of specific claims for payment allegedly rendered false by underlying regulatory violation, the Eleventh Circuit requires "some indicia of reliability" to support an allegation that actual false claims for payment were made to the government. *Clausen*, 290 F.3d at 1311; *see also United States ex rel. Schubert v. All Children's Health Sys., Inc.*, No. 8:11-cv-1687-T-27EAJ, 2013 WL 1651811, at *4 (M.D. Fla. Apr. 16, 2013). The Society alleges generally that it is a society of nearly 2,000 members, TAC ¶ 6, and that it has first-hand

knowledge, *id.*, ¶ 7, because its "members have personal knowledge" and therefore, "by extension, so does" the Society. TAC ¶ 7. The "personal knowledge" alleged by the Society and its members appears to be limited to second-hand rumors, including complaints that physicians allegedly made about the amount of money that anesthesiologists made[2] and a desire to "make money on anesthesia," *id.*, ¶¶ 30, 212. The complaint also refers to "closed-door meetings, *id.*, ¶ 174, but acknowledges its members were not in attendance, instead asserting that the subjects of those meetings were later discussed with ASC personnel who *then* reported the information to the Society. *Id.* This word-of-mouth reporting is purely hearsay without the indicia of reliability mandated under Rule 9(b). And nowhere does the TAC allege that any source observed the BGC Defendants preparing or submitting claims or statements to or for Medicare. The Eleventh Circuit has been clear that a relator cannot simply "base his knowledge on rumors." *See Van Raalte*, 2016 WL 2744949, at \*5 (citing *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006). The Society's contradictory claims that they "have personal knowledge" while in the same breath admitting that they do not have information relevant to the alleged remuneration, *see* TAC ¶ 123, highlights the insurmountable flaws of the TAC.

Contrary to the Eleventh Circuit mandate for reliability, the Society's most essential allegations are based on information and belief. TAC ¶ 211. This approach has been squarely rejected by the Eleventh Circuit. *See Clausen*, 290 F.3d at 1310 ("[W]hen Rule 9(b) applies, 'pleadings cannot be based on information and belief.'") Nevertheless, the Society alleges that

---

[2] These allegations are particularly suspect, as the Society states broadly that "surgeons at all ASC Defendants in this case complained openly and in the anesthesiologists' presence about the anesthesiologists making 'too much money' and about how it should be the surgeons that made money on anesthesia since they were the ones with (referring) the patients." TAC ¶ 30 (error in original). The Society states it was somehow privy to these complaints, but does not allege when they occurred or which surgeons made the complaints. The Society additionally does not connect these statements to any particular defendant or provide any facts that attribute these sentiments as the impetus for providing anesthesia services, or that such a move would constitute a violation of any law.

"[u]pon information and belief, Groover induced the non-BG ASC owners of Southpoint ASC to terminate NFAC and refer their anesthesia services to Southpoint Anesthesia by agreeing to and in fact kicking back a portion of the *anesthesia fees* generated by Southpoint Anesthesia to the ASC owners/referrers." TAC ¶ 211. This is the heart of the Society's allegations, but this "information and belief" is based on a Southpoint ASC "insider" who was anything but on the inside: he was not privy to any decision-making meetings and merely drew conclusions from discussions with non-BG ASC owners. *Id.*, ¶ 212. Again, the Society's allegations are based on nothing more than attenuated, unfounded rumors, lacking indicia of reliability and are not sufficient under 9(b). *Van Raalte*, 2016 WL 2744949 at *5 ("It is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, to base his knowledge on rumors, or to offer only conjecture about the source of his knowledge.")

The TAC's allegations about ownership interests are no substitute for plausible particular allegations that false claims were submitted. As discussed below, those allegations simply do not state a claim for violation of the AKS. The TAC purports to describe the ownership of Jax Anesthesia Providers LLC. *See id.*, ¶¶ 148, 157, 167, and 173. The Society then asserts in purely conclusory form that "the payment of kickbacks can be generally inferred from the genesis of the relationships whereby the original anesthesia providers were terminated for not providing kickbacks." *Id.*, ¶ 186. However, as this Court observed in dismissing Relator's SAC, "generally inferring" that kickbacks were paid does not pass 9(b) muster. *See* Dkt. 108 at 3 ("This Circuit has cautioned that drawing inferences about the submission of fraudulent claims would strip[] all meaning from Rule 9(b)'s requirement of specificity") (quotation omitted) (citing *Corsello*). Moreover, even if a "general inference" could overcome the Rule 9(b) mandate for specificity, the Society has failed to plead a factual foundation for the critical fact they purport to assert by

inference. No allegation in the TAC relays any factual description of the "genesis" of any particular "relationship" or the purpose for any particular "termination." Applying the Society's own standard, their "generally infer[able]" allegation that kickbacks were paid simply lacks any factual foundation as plead.

Furthermore, this Court already found "that the FSA is not a corporate insider does not excuse the insufficiency of its pleading." Dkt. 109 at 7. Obviously, "a corporate outsider likely does not have the required access to learn enough about the defendants' billing practices" to be able to satisfy Rule 9(b). *Mastej*, 591 F. App'x at 704 (citing *Clausen* for the proposition that "a corporate outsider's lack of information about the defendants' billing practices makes it more difficult to gather the factual specifics necessary to meet Rule 9(b)'s requirements"). Consequently, Relators proceeding under an "indicia of reliability" claim actually bear a stricter burden under Rule 9(b) concerning those alleged indicia. *See United States ex rel. Jallali v. Sun Healthcare Grp.*, No. 12-61011-CIV, 2015 WL 10687577, at *6 (S.D. Fla. Sept. 17, 2015), *aff'd sub nom. Jallali v. Sun Healthcare Grp.*, No. 15-14231, 2016 WL 3564248 (11th Cir. July 1, 2016) ([A]n alternate means by which a relator who lacks evidence of actual claims submitted …. impose strict requirements on qui tam relators and do not constitute a 'relaxation' of the standards."). The TAC does not plead plausible indicia of reliability under any standard.

Finally, to the extent Count V is premised on "false statements", that count is deficient not only for the failure to plead with particularity any false claims, but also because no false statements are pled with particularity. *See Hopper*, 588 F.3d at 1329 (holding that false statements themselves must be pled with particularity for an FCA "false statements" claim). Indeed, not a single false statement supposedly made by the BGC Defendants (or any defendant) is identified anywhere in the TAC. And the Society does not make any allegation that any claim

to the government was paid as a result of the alleged false statements, as required under Eleventh Circuit precedent. *Hopper*, 588 F.3d at 1328 ("[A] plaintiff must prove that the government in fact paid a false claim."). These shortcomings also present a basis for dismissal under Rule 9(b).

### B. The TAC fails to plead any violation of the AKS or the Stark Law with requisite particularity.

The Society argues that it need not identify an example of a false claim with the specificity normally required by the Eleventh Circuit because FCA liability "arose by reason of the underlying financial arrangements, which tainted every anesthesia bill." TAC ¶ 44. However, these circumstances do not exempt the Society from stating its claim with particularity -- instead, the underlying claims must *also* be alleged with particularity as required by Rule 9(b). *See All Children's Health Sys., Inc.,* 2013 WL 1651811, at *4 (when an FCA claim is based on an underlying violation, the unlawful scheme must be pled with particularity *in addition to* pleading the submission of the resulting claim with particularity).

### 1. The TAC fails to plead a violation of the AKS with plausibility and particularity.

The AKS imposes criminal liability on any person who knowingly and willfully offers or pays remuneration to induce or reward referrals of items or services reimbursable by a federal health care program. *See* 42 U.S.C. § 1320a-7b(b). As the Court observed, "in the context of a kickback scheme... '[t]o plead a violation of the Anti-Kickback Statute, the Relator must allege that (1) [defendant] knowingly and willfully (2) offered or paid any remuneration (3) to induce a physician to refer a patient for services that may be paid by a federal healthcare program." Dkt. 108 at 2-3. The TAC does not satisfy that standard. Further, the Society does not plead with particularity that any claims resulted from a violation of the AKS. As a result, the Society's AKS-based FCA claims must be dismissed.

### a. The Society does not plead with plausibility and particularity that BGC Defendants acted "knowingly and willfully."

Under the AKS, it is a crime to knowingly and *willfully* offer, pay, solicit, or receive any remuneration to induce or reward referrals of items or services reimbursable by a federal health care program. 42 U.S.C. § 1320a-7b(b)(2)(A); *see United States v. Vernon,* 723 F.3d 1234, 1252 (11th Cir. 2013). "Willfully" means that a person "must have acted voluntarily and purposely, with the specific intent to do something the law forbids, that is, with a bad purpose, either to disobey or disregard the law." *United States v. Sosa,* 777 F.3d 1279, 1293 (11th Cir. 2015) (citations and quotations omitted). "To plead this element, Relator must allege that Defendants acted 'with knowledge that [their] conduct was unlawful.'" *United States ex rel. Osheroff v. Tenet Healthcare Corp.,* No. 09-22253-CIV, 2012 WL 2871264, at *8 (S.D. Fla. July 12, 2012) (citation omitted).

However, the TAC does not provide any *factual* basis for concluding that the BGC Defendants acted willfully in contravention of the law. It speculates that the purpose for entering into anesthesia arrangements was to pay anesthesiologists less than what the companies received from payors and to use this difference to pay kickbacks, TAC ¶ 227, but alleges no facts in support. The TAC does not explain how remuneration was paid, by what mechanism, or specifically to whom. And, without sufficient pleading as to the unlawful conduct, it is impossible to allege that any BGC Defendants knew they were violating any law when engaged in that conduct. Therefore, the Society has not satisfied this pleading requirement and its TAC should be dismissed with prejudice to the Society (and its members).

### b. The Society does not plausibly plead that any particular remuneration was paid.

"[T]he AKS defines remuneration as including 'transfers of items or services for free or

for other than fair market value.'" *Ameritox, Ltd. v. Millennium Labs., Inc.*, 20 F. Supp. 3d 1348, 1356 (M.D. Fla. 2014) (quoting 42 U.S.C. § 1320a–7a(i)(6)).[3] Thus, to adequately plead remuneration, the Society should, at the very least, allege facts showing that the anesthesia fees paid by the BGC Defendants were below market value and that BGC Defendants received some benefit that was something beyond a fair market value exchange. However, the Society does not plead facts showing fair market value for anesthetist services, or what BGC anesthesia companies actually charged for their services. In fact, though the Society generally comments that "charging less than fair market value" is an artifice for remuneration, TAC ¶ 34, the Society never again mentions fair market value let alone alleges any facts suggesting that the BGC business arrangements resulted in payments for services below *market value.*

Not only does the Society not allege that the anesthesia rates paid to anesthesiologists employed by BGC's anesthesia companies were below market value, they only allege, with no factual support, that the rates paid were "significantly lower than what Groover's anesthesia companies bill and receive as anesthesia fees from payors." TAC ¶ 203. The Society alleges that this difference "is what Groover uses to pay kickbacks to referrers, including himself." *Id.* At best, even if this difference could constitute remuneration, there are no facts to support the notion that there is *actually* a gap between what the anesthesia companies were paid and what BGC defendants received from any federal program. The Society does not provide amounts that the

---

[3] While 42 U.S.C. § 1320a–7b(b)(1)(A) does not provide a definition for remuneration, the statute's counterpart in the Civil Money Penalties Law does define the term. 42 U.S.C. § 1320a–7a(i)(6). Courts in this Circuit have applied that definition in the criminal context. *See United States ex rel. Freedman v. Suarez-Hoyos*, 781 F. Supp. 2d 1270, 1281 (M.D. Fla. 2011); *see also United States ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-cv-58, 2014 WL 7272598, at *13 (S.D. Ga. Dec. 18, 2014) (" '[C]ourts use 'fair market value' as the gauge of value when assessing the remuneration element of the [AKS].'") (quoting *United States ex rel. Jamison v. McKesson Corp.*, 900 F.Supp.2d 683, 699 (N.D. Miss.2012)).

anesthesia companies charged for their services. Nor does the Society allege what Medicare or Medicaid paid for those services. Their allegations remain completely conclusory.

Further, the Society does not plead *how* or *when* Dr. Groover allegedly paid remuneration to referring surgeons. The complaint does not provide any evidence that referrers received any unlawful benefit from the alleged difference. And, of course, the Society is not in a position to allege these facts. They have no knowledge of the contracts with the anesthesiologists or CRNAs, and they do not possess documents that show improper payments to any physician. They do not know the individual amounts billed to Medicare or Medicaid by the BGC Defendants for the alleged referring physicians. They allege no information about payment and billing processes at all. Nor do they allege to have such knowledge.

As a result, the TAC is completely devoid of allegations regarding what remuneration was allegedly paid in violation of the AKS, any actual inducements or improper referrals, or any date on which these alleged inducements or referrals purportedly occurred. The fact that the Society is a corporate *out*sider does not justify an exception to the particularity requirements under Rule 9(b). *Clausen,* 290 F.3d at 1314. The Society has not and cannot provide any indicia of reliability to support a claim under the FCA. As to the BGC Defendants, the TAC should be dismissed with prejudice.

### c. The Society does not plausibly plead that particular remuneration was paid with the intent to induce referrals.

Finally, "the [AKS] forbids knowingly 'offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person *to induce such person ... to refer an individual* [for medical services] for which payment may be made in whole or in part under a Federal health care program' such as Medicare." *Mastej*, 591 F. App'x at 696 (emphasis in original). Put simply, the Society must

plead facts that the remuneration was paid "*to induce the doctors to refer individuals* to the defendants for the furnishing of medical services." *Id.*, at 698. The Society does not identify a single conversation, communication, or document by any BGC defendant that would evidence such intent. *See United States ex rel. Van Raalte v. Healogics, Inc.*, No: 6:14-cv-283-Orl-31KRS, slip op. at *1 (M.D. Fla. Dec. 13, 2016) (noting that "broad references" to the defendant "will not do" under Rule 9(b)) (citing *United States ex rel. Romanosky v. Aggarwal*, No. 6:03-cv-117-Orl-31KRS, 2005 WL 6011259, at *5 n. 10 (M.D. Fla. Feb. 10, 2005).

Instead, the TAC broadly alleges Dr. Groover induced the non-BG ASC owners of Fleming Island, Orange Park, and Southpoint ASCs to terminate existing anesthesia providers and refer their anesthesia services to BGC anesthesia companies "by agreeing to and in fact kicking back a portion of the anesthesia fees generated by" BGC anesthesia companies as a result of the referrals. TAC ¶¶ 183, 211. With respect to the Orange Park and Fleming Island ASCs, the Society asserts that Dr. Groover "sought to convert AACC into a company model provider that would share its anesthesia fees with the ASC referrers/owners in exchange for receiving the anesthesia referrals." *Id.*, ¶ 173. Aside from merely assuming this to be the purpose, the Society provides no fact to indicate that this *was* the purpose. The Society only states that internal discussions – of which the Society has no personal knowledge – determined that the ASCs would move to so-called "company models" and that "anesthesia revenue" would be "share[d]." *Id.*, ¶ 174. Thus, the TAC alleges that remuneration was paid with an intent to induce referrals based only on hearsay and speculation about what Dr. Groover "sought" out. This is plainly insufficient.

### d. The Society does not plausibly allege that particular false claims *resulted from* the payment of allegedly unlawful remuneration.

The 2010 amendment to the AKS confirmed that non-compliance with the AKS could be

material to payment of a claim if, and only if, the claim was shown to have resulted from the violation of the AKS. *See* Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, §6402(f), 124 Stat. 119 (codified at 42 U.S.C. §3120a-7b(g) (2010)) (claim is "false or fraudulent for the purposes of [the FCA]" when the claim "includes items or services *resulting from* a violation of [the AKS]"). As discussed above, the TAC does not allege facts to show any claims "resulting from" unlawful referrals.[4]

Underscoring the lack of particularity, the TAC does not allege specific details showing that Dr. Groover or any other physician or provider actually engaged in any prohibited referral as a result of any (unidentified) remuneration. When did such a referral occur? How was the remuneration offered or solicited and when? Who agreed to provide a referral in exchange for remuneration? For what patient(s)? What treatment was provided as a result that was billed to Medicare or Medicaid? These pieces of information are critical to show that unlawful conduct actually occurred. Without the underlying unlawful conduct, any bills submitted to the government simply were not "false."

### 2. The TAC cannot plead a violation of the Stark Law.

As noted above, the operative provision of the Stark Law prohibits physicians from referring Medicare patients for "Designated Health Services" to an "entity" with which the physician has a "financial relationship," unless a statutory or regulatory exception applies. *See* 42 U.S.C. § 1395nn(a)(1)(A). The statute also prohibits the DHS Entity from billing Medicare for DHS provided as a result of that referral. *Id.* § 1395nn(a)(1)(B). The Society's claims under the Stark Law fail for one simple reason: neither ASC services, nor the anesthesia services provided at the ASCs, are DHS. *See* 42 CFR 411.351.

---

[4] As such, the TAC is too deficient to raise at this stage questions of materiality under the standard the Supreme Court recently stated in *Escobar. See* 136 S. Ct. at 2002.

By failing to plead facts demonstrating (1) any underlying violation of the law with particularity and, additionally, (2) that any provider submitted a claim as a result of the unlawful conduct, the Society's TAC fails to satisfy Rule 9(b). *See United States ex rel. Keeler v. Eisai, Inc.,* 568 F. App'x 783, 799-800 (11th Cir. 2014). As a result, the TAC should be dismissed with prejudice as to the BGC Defendants.

## II.     THE SOCIETY'S RELIANCE ON AN OIG ADVISORY OPINION DOES NOT STATE A PLAUSIBLE CLAIM WITH PARTICULARITY.

The Society summarily alleges that the BGC Defendants violated the AKS because they adopted an anesthesia services arrangement utilizing "analogous practices" to a Proposal in an HHS OIG Advisory Opinion. *See* TAC, ¶ 237. Indeed, the Society's sole basis for assuming that something about BGC's corporate structure violates the AKS, and thus the FCA, is that Advisory Opinion. *See* TAC, ¶¶ 237-241. But that allegation of fraud by analogy is flawed in three major respects.

First, the Society's reliance on the Advisory Opinion simply ignores clear language on the Opinion's face that forbids the inference the Society seeks to draw from it. The Opinion provides that it "has no application to, and cannot be relied upon by, any other individual or entity" other than the requestor, and "has no applicability to other arrangements, *even those which appear similar* in nature or scope." HHS OIG Advisory Opinion at 11 (emphasis added). Nevertheless, the Society's allegation is that the BGC Defendants violated the law by adopting structures that are "analogous" to the descriptions contained in the Advisory Opinion. *See* TAC ¶ 237. As a result of this express limitation, not a single court has held that a non-precedential OIG advisory opinion can be used to establish liability under the AKS. *See e.g., Klaczak v. Consol. Med. Transp.,* 458 F. Supp. 2d 622, 68586 (N.D. Ill. 2006) ("No person or entity can rely on an advisory opinion issued to someone else"); *United States ex rel. McDonough v. Symphony*

*Diagnostic Servs., Inc.,* 36 F. Supp. 3d 773, 780 (S.D. Ohio 2014) (an Advisory Opinion "does not render a practice *per se* illegal or unlawful"); *Hericks v. Lincare Inc.,* Civil Action No. 07-387, 2014 WL 1225660, at \*11-12 (E.D. Pa. Mar. 25, 2014) (an Advisory Opinion does not "establish that [the defendant's activity] violated the Anti-Kickback Act"). Nothing about the Society's vague allegations compels this Court to be the first.

Moreover, even as a non-precedential example of legal reasoning under the AKS, the Advisory Opinion confirms that the TAC falls woefully short of alleging with particularity facts that establish a plausible violation of that statute. The Advisory Opinion sets forth a multitude of specific facts upon which the OIG based its analysis of the particular arrangement and its conclusion that the arrangement *could possibly* violate the AKS. And beyond those basic facts, as the Advisory Opinion notes, any conclusion that an arrangement *actually violates* the AKS requires evidence that was not before the OIG: "Any definitive conclusion regarding the existence of an anti-kickback violation requires a determination of the parties' *intent*, which determination is beyond the scope of the advisory opinion process." HHS OIG Advisory Opinion at 2 (emphasis added). The Society's allegations against the BGC Defendants contain neither a detailed structural analysis nor allegations from which the Court could infer improper intent. As such, the Advisory Opinion is irrelevant to the Society's allegation that the BGC Defendants violated the AKS, or, for that matter, the FCA.

Finally, even if an inference of impropriety of other arrangements were not expressly forbidden, the Advisory Opinion is drawn from facts about (1) exclusive billing arrangements, (2) the terms and conditions under which an independent contractor operates, (3) the rate that subsidiaries pay for certain services, (4) from what collection source fees for those services would be paid, (5) how profits would be distributed, and (6) the sole purpose for which a

subsidiary was established. HHS OIG Advisory Opinion at 4-5, 8-10. Among other things, the Advisory Opinion examines whether those facts show that certain of the AKS safe harbors are inapplicable. *Id.* at 8-9. The TAC pleads no comparable facts about any of these circumstances.

For all of these reasons, the Society's legal theory fails to state a claim to the extent it is based on the HHS OIG Advisory Opinion.

## III.     THE TAC FAILS TO STATE A CLAIM UNDER THE FFCA.

The TAC correctly asserts that "the Florida Medical False Claims Act provides a cause of action for an individual to bring a cause of action on behalf of the State of Florida against defendants *for false and/or fraudulent Medicaid claims*." TAC ¶ 52. Indeed, the FFCA only makes liable a person "who knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property *to the state*." TAC ¶ 51 (citing Fla. Stat. Ch. 68.081(g)). However, the Society does not allege that any BGC Defendant submitted any claim to Medicaid. Without that, the Society has failed to plausibly plead a claim under the FFCA – let alone plead the details of the fraud with particularity.

Furthermore, as with the Society's failure under the FCA, the TAC does not plausibly demonstrate that any of the BGC Defendants violated an underlying statute. And, without that underlying violation, the Society has not shown that any claim was false. As such, the Society's FFCA claims should be dismissed.

## CONCLUSION

The Society has now tried, and failed, four times to state claims against BGC defendants for violations for the FCA and FFCA. Through each of these filings and publicity generated by the Society *(see* http://www.fsahq.org/anesthesia-company-model-faqs/), the BGC Defendants have been subject to the perpetuation of unsubstantiated and generalized allegations of fraud. By

failing to "specifically plead the minimum elements of [its] allegation[s]," the Society is "needlessly harm[ing] . . . [the BGC Defendants'] goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *Clausen,* 290 F.3d at 13134 n. 24. For these and each of the foregoing reasons, the BGC Defendants respectfully request that the Court grant this Motion and dismiss the TAC with prejudice to the Society (and its members).

Respectfully submitted this 16th of December, 2016.

HOGAN LOVELLS LLP
*By:/s/ Jonathan Diesenhaus*

Jonathan L. Diesenhaus
Admitted Pro Hac Vice
Hogan Lovells US LLP
555 13th Street, N.W.
Washington, DC 20004
Telephone: (202) 637-5416
Facsimile: (202) 637-5910
jonathan.diesenhaus@hoganlovells.com

ROGERS TOWERS, P.A.
*By:/s/ Robert H. Pritchard*

Robert H. Pritchard
Florida Bar No. 890367
Janet C. Owens
Florida Bar No. 0099592
1301 Riverplace Boulevard, Suite 1500
Jacksonville, Florida 32207
Telephone: (904) 398-3911
Facsimile: (904) 396-0663
rpritchard@rtlaw.com
jowens@rtlaw.com

*Counsel for Defendants Jax Anesthesia Providers, LLC, Southpoint Anesthesia, LLC, Borland-Groover Clinic, P.A. and BGC Holdings, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 16th, 2016, I electronically filed the foregoing with the

Clerk of Court by using the Court's CM/ECF system thereby serving all registered users in this

case.

> */s/ Robert H. Pritchard*
> Robert H. Pritchard,
> Florida Bar No. 890367