UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA, THE
STATE OF FLORIDA, *ex rel.* FLORIDA
SOCIETY OF ANESTHESIOLOGISTS,

    Plaintiffs/Relators,

vs.

                                           Case No. 8:13-cv-2603-T-27AEP

UMESH CHOUDHRY, *et al.*,

    Defendants.
_____/

## ORDER

**BEFORE THE COURT** are motions to dismiss the Third Amended Complaint filed by defendants North Pinellas Surgery Center, LLC (Dkt. 116), Clearwater Ambulatory Surgery Centers, Inc. d/b/a Clearwater Endoscopy Center (Dkt. 117), Advanced Anesthesia Associates, LLC and All Services Anesthesia, LLC (Dkt. 119), Umesh Choudhry and Curvv, LLC (Dkt. 120), Safety Harbor Surgery Center, LLC (Dkt. 122), E Street Endoscopy LLC d/b/a West Coast Endoscopy Center (Dkt. 123), and Physicians Endoscopy Holdings Inc. and St. Petersburg Endoscopy, LLC (Dkt. 126), to which the Florida Society of Anesthesiologists ("Relator") has filed a consolidated response in opposition (Dkt. 142). Upon consideration, the motions to dismiss are **GRANTED** without prejudice, with one final opportunity to amend.[1]

---

[1] The Third Amended Complaint must satisfy two pleading standards. First, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but more than an unadorned, conclusory accusation of harm are. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must "plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And while "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678.

## BACKGROUND

Relator, a not-for-profit professional organization consisting of nearly 2,000 anesthesiologists throughout Florida (Dkt. 110 at ¶ 6), alleges that health care providers violated the False Claims Act, 31 U.S.C. § 3729(a)(1), and the Florida Medicaid False Claims Act, Fla. Stat. §§ 68.081, *et seq.*, by seeking reimbursement for anesthesia services that were tainted by a kickback scheme. This order addresses the claims against defendants Dr. Umesh Choudhry and his related companies, which are centered on the west coast of Florida. A separate order addresses the claims against Dr. Jack Groover and his companies, centered on the east coast of Florida.

According to Relator, the kickback scheme involves surgeons at Choudhry-owned ambulatory surgical centers who refer patients to Choudhry-owned anesthesia companies. The anesthesia companies pay a contractor to provide anesthesia services (an anesthesiologist or nurse anesthetist) at a lower rate than ultimately reimbursed by Medicare. (Dkt. 110 at ¶¶ 122, 239) The anesthesia company then uses the "spread" or "delta" between the contractor's rate and the Medicare reimbursement to pay kickbacks to the surgeons. (*Id.*) Essentially, this arrangement allows surgeons to receive a portion of anesthesia revenues, despite the fact that the surgeons are not anesthesiologists. (*Id.* at ¶¶ 30-32) Relator alleges that the kickback scheme results in overutilization of anesthesia and attendant harm to patients. (*Id.* at ¶ 231)

The term "company model" refers to an arrangement in which surgeons own the anesthesia companies from which they extract revenue. (*Id.* at ¶¶ 24, 238) On June 1, 2012, the Office of the

---

Second, the complaint must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). The particularity requirement of Rule 9(b) is satisfied if the complaint alleges "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009).

Inspector General (OIG) for the Department of Health and Human Services issued Advisory Opinion No. 12-06, which determined that two proposed financial arrangements between an anesthesia company and physician-owned corporations "could potentially generate prohibited remuneration" in violation the federal Anti-Kickback Statute.[2] (Dkt. 110-4) Although that opinion was highly fact-specific, Relator alleges that the defendants' scheme uses "[a]nalogous practices," with "some permutations." (Dkt. 110 at ¶¶ 237, 241)

However, the facts alleged in the Third Amended Complaint are thin. Relator acknowledges that it does not know "the exact amount and mechanism for the funneling of the kickbacks." (*Id.* at ¶ 123) Similarly, Relator admits that "[o]nly the companies and individuals who internally divided up and carried out the kickbacks know how the scheme worked." (Dkt. 142 at 30) As defendants point out, Relator's lack of inside knowledge is not surprising, since Relator is a corporate outsider, in contrast to the typical *qui tam* relator. Relator's most salient facts follow.

Umesh Choudhry is a gastrointestinal physician and surgeon. (Dkt. 110 at ¶ 17) Choudhry controls defendant Curvv, LLC, which manages defendant Advanced Anesthesia Associates, LLC ("AAA"). (*Id.* at ¶¶ 56-57) Choudhry also controls other anesthesia companies, including defendant All Services Anesthesia, LLC. (*Id.* at ¶ 59)

Choudhry's anesthesia companies supply anesthesia services to several ambulatory surgical centers (ASCs) that Choudhry owns or partially owns, including five named defendants in this action: North Pinellas Surgery Center, LLC ("North Pinellas ASC"), Clearwater Ambulatory Surgery Centers, Inc. d/b/a Clearwater Endoscopy Center ("Clearwater ASC"), Safety Harbor Surgery Center,

---

[2] "[A] claim that includes items or services resulting from" a violation of the federal Anti-Kickback Statute is a "false" claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

LLC ("Safety Harbor ASC"), E Street Endoscopy d/b/a West Coast Endoscopy Center ("West Coast ASC"), and St. Petersburg Endoscopy Center, LLC ("St. Petersburg ASC"). (*Id.* at ¶¶ 59, 65, 67, 69-71, 74) The remaining defendant in the "Choudhry ring" is Physicians Endoscopy Holdings, Inc., which is Choudhry's private practice and a partial owner of West Coast ASC. (*Id.* at ¶¶ 61-62, 73)

In early 2012, AAA's business manager, Sean Singh, proposed to North Pinellas ASC that it replace its anesthesia company "pursuant to a model whereby North Pinellas directly or through their surgeon owners could participate in the anesthesia revenues generated by AAA." (*Id.* at ¶ 83) The North Pinellas ASC owners asked their current anesthesia provider, Bay Associates Anesthesia ("BAA"), to match the proposal, "namely, to allow the North Pinellas ASC owners to receive payments for their anesthesia referrals in the form of a portion of the anesthesia fees." (*Id.* at ¶¶ 85-86) BAA turned down the proposal, "having concluded that it was unlawful." (*Id.* at ¶ 87) One of the physician board members of North Pinellas ASC remarked that the board members "realize the quality will suffer, but they don't want to leave money on the table." (*Id.* at ¶ 88) BAA's contract was terminated and it was replaced by one of Choudhry's anesthesia companies, which is managed by AAA. (*Id.* at ¶ 90)

Relator alleges, "[u]pon information and belief," that similar proposals were made to West Coast ASC, St. Petersburg ASC, and Clearwater ASC. (*Id.* at ¶ 84) Those ASCs also terminated their anesthesia providers in favor of Choudhry's anesthesia companies, each of which is managed by AAA. (*Id.* at ¶¶ 91-93)

With respect to Safety Harbor ASC, Relator alleges additional facts. Similar to North Pinellas ASC, Sean Singh proposed a "model whereby Safety Harbor ASC directly or through their surgeon owners could participate in the anesthesia revenues generated by AAA." (*Id.* at ¶ 97) Following that

4

proposal, Safety Harbor ASC told its current anesthesia company, Anesthesia Associates of Pinellas County ("AAPC"), that "Safety Harbor ASC would be terminating AAPC's anesthesia contract in July of 2012 to go on company model with Choudhry because Choudhry would share a portion of the anesthesia revenue with them." (*Id.* at ¶ 98)

In June 2012, the OIG issued its advisory opinion. (*Id.* at ¶ 99) Safety Harbor ASC learned of the opinion and allowed AAPC to remain beyond the July 2012 termination date. (*Id.* at ¶¶ 99-100) Safety Harbor ASC owners Dr. Ted Small, Dr. Robert Davidson, Dr. Brian Oliver, and Dr. Dana Deupree told one of AAPC's members, Dr. Jay Epstein, "on multiple occasions that they were holding off from terminating AAPC and going on company model with Choudhry for a while 'to see if anyone went to jail.'" (*Id.* at ¶¶ 101-102) By November 2012, "no one had gone to jail and these same surgeon owners of Safety Harbor ASC told Dr. Epstein 'we are going for it.'" (*Id.* at ¶ 103) Safety Harbor terminated AAPC's contract and began using All Services Anesthesia. (*Id.* at ¶¶ 104)

Relator alleges that from the date of the termination of the contracts with the independent anesthesia providers "every single referral to Choudhry, AAA, and the [other anesthesia companies] was tainted by kickbacks and billings for same constituted false claims." (*Id.* at ¶¶ 95, 105)

According to Relator, AAA is the "central" entity through which Choudhry contracts with anesthesiologists and nurse anesthetists. (*Id.* at ¶¶ 106-107) AAA pays the contractors based on an hourly rate. (*Id.* at ¶ 108) The contractors bill the anesthesia companies, AAA collects the billing information for each anesthesia company, and AAA then bills government programs for the contractor's services under each contractor's individual billing number. (*Id.* at ¶¶ 111-113) Relator alleges that the billing is arranged in this manner "to diffuse accountability for the practices at issue in this lawsuit," and "to allow the accounting personnel inside AAA and/or Choudhry's network of

5

entities to segregate company model funds and kickbacks on an ASC by ASC basis." (*Id.* at ¶¶ 117-118)

The Third Amended Complaint identifies five anesthesiologists for whom AAA billed Medicare:

> a. $18, 899.40 for Negesh Bailur, MD for 24 Medicare [b]eneficiaries.
> b. $44,665 for Vivian Benci, MD for 258 Medicare beneficiaries.
> c. $262,465.75 for Steven Feinerman, MD for 222 Medicare beneficiaries.
> d. $448,808.33 for Ngoc Nguyen, MD for 307 Medicare beneficiaries.
> e. $98,361.18 for Thomas M. Woods[,] MD for 156 Medicare beneficiaries.

(*Id.* at ¶ 114) The defendants contend that these allegations are based on readily-available public information. (*E.g.*, Dkt. 126 at 5)

Relator alleges that "AAA pays the contractors rates significantly lower than what Choudhry bills and receives from payors, such as Medicare." (Dkt. 110 at ¶ 120) For instance, an unidentified anesthesiologist who works at Safety Harbor ASC received "approximately $300,000 in compensation, but generates approximately $900,000 in anesthesia revenues on cases referred by Safety Harbor ASC." (*Id.* at ¶ 122) Relator maintains that "[e]ven accounting for approximate overhead and other expenses, the delta between what Choudhry collects for these services ($900,000) and what he pays the contractor ($300,000) leaves close to $500,000 in profit from the anesthesia billings that is shared with the Safety Harbor ASC owners/referrers." (*Id.*)

Relator alleges that "contractor/s have reported to [Relator] hundreds of incidences of referrer/surgeons at the ASCs, including but not limited to [physicians] Michael Zelig, Anoop Goyal, and John Ann, boasting openly about how much money they were making from anesthesia services since Choudhry's companies began to perform them." (*Id.* at ¶ 124) "Relator is also privy to the existence of text messages in which exchanges about these transfers of value are captured which will be sought in discovery." (*Id.* at ¶ 125)

6

As a result of the alleged kickback scheme, Relator contends that physicians have "sought to maximize those kickbacks by substantially increasing the number of anesthesia cases." (*Id.* at ¶ 131) For instance, while North Pinellas ASC was still working with its independent provider, BAA, anesthesia was used in approximately 60% of procedures. (*Id.* at ¶ 132) After BAA was replaced by a Choudhry entity, "the anesthesia utilization increased to nearly 100% of the procedures." (*Id.*)

## DISCUSSION

### 1. Shotgun pleading

Relator's previous complaint was dismissed for two reasons. First, the complaint identified two distinct kickback schemes—the scheme involving the Choudhry defendants and a similar scheme involving Dr. Jack Groover and his businesses—but Relator failed to include any facts connecting the two schemes. Second, Relator impermissibly lumped together all defendants. (Dkt. 109 at 5-6)

The Third Amended Complaint suffers from similar defects. Relator now identifies a "Groover Ring" and a "Choudhry Ring" and pleads separate claims against each group. (Dkt. 110 at ¶¶ 254-269) But Relator again pleads no facts connecting the two schemes, apart from alleging that both used an improper company model. (*Id.* at ¶¶ 248-250) Relator concedes that severing the claims would remedy this defect. (Dkt. 142 at 31-32)[3]

More problematic, however, Relator pleads its claims against the Choudhry defendants collectively, despite the fact that they apparently possessed different roles in the alleged fraud. (*Id.* at ¶¶ 254-261) Likewise, the supporting factual allegations define the term "Choudhry" to refer to

---

[3] If Plaintiff amends, a severance of the claims against the Choudhry defendants and those against the Groover defendants would be appropriate.

7

Choudhry and his entities collectively, without differentiation. (*Id.* at ¶ 61)

Based on these deficiencies, the Third Amended Complaint is due to be dismissed. *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 & n.14 (11th Cir. 2015); *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007). If Relator files a Fourth Amended Complaint, Relator must identify specific defendants in its factual allegations, plead separate counts against each defendant (or group of defendants, if related), and incorporate by reference only the facts relevant to each defendant. Relator shall also omit extraneous "background" information and legal argument.

## 2. Anti-Kickback Statute

The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits a person from paying or receiving kickbacks to induce the referral of an individual for services paid under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1)-(2). In 2010, Congress amended the statute to specify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g). Thus, Relator's claims under the False Claims Act are premised on underlying violations of the Anti-Kickback Statute.[4] (Dkt. 110 at ¶ 37)

A violation of the Anti-Kickback Statute occurs when a defendant: (1) knowingly and

---

[4] Prior to the 2010 amendment, the Eleventh Circuit determined that a violation of the Anti-Kickback Statute was actionable under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), pursuant to an "implied false certification" theory. *E.g., McNutt ex rel. United States. v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259-60 (11th Cir. 2005); *United States ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 799 (11th Cir. 2014) (characterizing *McNutt* as an implied false-certification case). The parties do not address whether that theory remains necessary or viable in light of the amendment to the Anti-Kickback Statute. *Compare United States ex rel. Lutz v. Blue Eagle Farming, LLC*, 853 F.3d 131, 135 (4th Cir. 2017) (holding that a violation of the Anti-Kickback Statute "that results in a federal health care payment is a *per se* false claim"), *with United States ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 335 (S.D.N.Y. 2014) (holding that the amendment "did nothing to alter the false certification theory of claim 'falsity'").

8

wilfully, (2) "offers or pays any remuneration," directly or indirectly, (3) to induce a person to refer individuals to the defendants for the furnishing of medical services, (4) paid for by Medicare. *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 705 (11th Cir. 2014) (citing 42 U.S.C. § 1320a-7b(b)(2)(A)). In a tandem provision, the Anti-Kickback Statute prohibits "solicit[ing] or receiv[ing] any remuneration." 42 U.S.C. § 1320a-7b(b)(1)(A).

Relator must allege the kickback scheme with particularity under Rule 9(b), including the "time, place, and substance of the defendant's alleged fraud." *Hopper*, 588 F.3d at 1324 (internal quotation marks omitted); *Mastej*, 591 F. App'x at 705-706. For instance, a relator satisfies Rule 9(b) by alleging "the names of the doctors who received the incentives, the names of the defendants' employees who negotiated the incentives with the doctors, precisely what the incentives were, when they were provided, why they were provided, and why they were illegal." *Id.* at 705.

The Third Amended Complaint fails to identify with particularity who arranged the kickbacks, who received the kickbacks, precisely what the incentives were, or when and how they were provided. Indeed, Relator admits that it does not know "the exact amount and mechanism for the funneling of the kickbacks back to the ASCs/referrers." (Dkt. 110 at ¶ 123) Relator's allegations are particularly deficient with respect to defendants Clearwater ASC, St. Petersburg ASC, and West Coast ASC because they rest "[u]pon information and belief." (Dkt. 110 at ¶ 84) The Third Amended Complaint is also silent as to the role of defendant Physicians' Endoscopy Holding, Inc., which is Choudhry's private practice.

With respect to North Pinellas ASC and Safety Harbor ASC, Relator provides more detail, but its allegations still fail to meet Rule 9(b) standards. Relator conclusorily alleges that AAA's proposal to "share anesthesia revenue" was actually a demand for "kickbacks." (Dkt. 110 at ¶¶ 89,

98) Relator surmises that AAA employs a billing model to hide the kickbacks and allow for their distribution. (*Id.* at ¶¶ 117-118) Relator theorizes that kickbacks are funded by "[t]he difference or spread between the invoiced charges to Medicare and the payment to the contractors." (*Id.* at ¶¶ 121-122) But Relator includes no specific facts to support these allegations.

Alternatively, Relator alleges that "the payment of the kickbacks can reliably be inferred" because North Pinellas ASC and Safety Harbor ASC terminated their relationship with the independent anesthesia companies, BAA and AAPC, and replaced them with Choudhry-controlled anesthesia companies. (Dkt. 110 at ¶ 123) But conjecture plainly does not satisfy Rule 9(b) pleading standards. And while physicians at Safety Harbor ASC delayed replacing AAPC, "to see if anyone went to jail," that falls well short of pleading a kickback scheme with particularly. (*Id.* at ¶ 102)

To the extent Relator argues that the "company model" itself qualifies as a violation of the Anti-Kickback Statute by virtue of the OIG's Advisory Opinion No. 12-06, Relator provides no authority for that conclusion. *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, 36 F. Supp. 3d 773, 780 (S.D. Ohio 2014) (noting that an OIG advisory opinion does not render a practice *per se* unlawful); *Hericks v. Lincare Inc.*, No. CIV.A. 07-387, 2014 WL 1225660, at *12 (E.D. Pa. Mar. 25, 2014) (same).

Moreover, the opinion expressly stated that it "has no applicability to other arrangements, even those which appear similar in nature or scope," and the OIG concluded only that the facts "*could potentially* generate prohibited remuneration under the anti-kickback statute." (Dkt. 110-4 at 1-2, 11 (emphasis added))

Relator is not permitted to conclusorily assert that the defendants are receiving kickbacks and then pursue discovery to support its allegations. Rule 9(b)'s particularity requirement "serves an

10

important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (internal quotation marks omitted). "When a plaintiff does not specifically plead the minimum elements of their allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *Clausen*, 290 F.3d at 1313 n.24.

Although Relator will be granted one final opportunity to amend to correct these deficiencies, Relator must satisfy the Rule 9(b) pleading standards.

### 3. Violation of 31 U.S.C. § 3729(a)(1)(A)

Even if Relator successfully pleaded an underlying violation of the Anti-Kickback Statute, Relator must still allege a violation of the False Claims Act. *Mastej*, 591 F. App'x at 706. In Count I, Relator alleges that the Choudhry defendants violated 31 U.S.C. § 3729(a)(1)(A), which creates a cause of action against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Under this provision, the "central question" is whether defendants "presented or caused to be presented" a false claim. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015) (quoting *Hopper*, 588 F.3d at 1325-26).

To satisfy the presentment requirement, a relator "must allege the actual presentment of a claim . . . with particularity, meaning particular facts about the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Urquilla-Diaz*, 780 F.3d at 1052 (internal quotation marks omitted). "Providing exact billing data—name, date, amount, and services

11

rendered—or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted." *Mastej*, 591 F. App'x at 704. Alternatively, "a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims." *Id.* But "[i]t is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, to base his knowledge on rumors, or to offer only conjecture about the source of his knowledge." *Id.* at 704-705 (internal citations omitted).

Relator concedes that it possesses no specific claims or billing data. (Dkt. 110 at ¶ 44) And although Relator speculates as to the defendants' billing practices, Relator fails to plead any facts suggesting that it has "direct, first-hand knowledge" of those practices. (Dkt. 110 at ¶¶ 106-130); *Mastej*, 591 F. App'x at 704. Relator does not assert that any of its members (or anyone else) is even minimally acquainted with the claims practices for any defendant in this matter. *See United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 n.4 (11th Cir. 2010) (rejecting relator's vague allegations that the she had "found" unspecified documents, and "discovered" or "learned" that defendants submitted false claims); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005) (rejecting relator's allegation that he was "aware" of billing practices because it "was neither particular to any specific fraudulent claim against the government nor factually supported"); *Atkins*, 470 F.3d at 1358-1359 (rejecting relator's allegations that were based on rumor).

Contrary to Relator's argument in response to the motions to dismiss, its status as a corporate outsider does not excuse its obligation to come forward with reliable allegations. As highlighted in the previous dismissal order (Dkt. 109 at 7), the Eleventh Circuit categorically rejects that argument:

> We are not unsympathetic to the situation in which [the relator] finds himself. Most relators in *qui tam* actions are insiders. As a corporate outsider, he may have had to work hard to learn the details of the alleged schemes entered into by LabCorp through years of making contacts in and learning about the industry while not being privy to LabCorp's policy manuals, files and computer systems. But, while an insider might have an easier time obtaining information about billing practices and meeting the pleading requirements under the False Claims Act, *neither the Federal Rules nor the Act offer any special leniency under these particular circumstances to justify [the relator] failing to allege with the required specificity the circumstances of the fraudulent conduct he asserts in his action.*

*Clausen*, 290 F.3d at 1314 (emphasis added).

Relator relies on a Southern District of Florida decision in which the alleged kickbacks consisted of favorable lease agreements and a parking easement for the referring physicians. *United States ex rel. Bingham v. HCA, Inc.*, No. 13-23671-CIV, 2016 WL 344887 (S.D. Fla. Jan. 28, 2016) (Cooke, J.). The relator in *Bingham* did not allege that a specific claim was presented to the government for payment. Rather, the relator relied on publicly-available information regarding the defendant's revenues from Medicare and Medicaid, and the names of referring physicians and their aggregate number of Medicare patient referrals to the defendant's hospital. *Id.* at *8.

The court observed that the alleged fraud "does not depend as much on the particularized billing content of any given claim;" rather, "improper relationships with referring physicians taint every claim submitted as a result of those referrals." *Id.* Based on the facts alleged, the relator provided sufficient "indicia of reliability" that defendant actually submitted false claims. *Id.*; *accord United States v. Baycare Health Sys.*, No. 8:14-CV-73, 2015 WL 4878456 at *2-5 (M.D. Fla. Aug. 14, 2015) (Merryday, J.) (addressing kickback scheme based on rent concessions and a parking easement); *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264 at *1, 5-6 (S.D. Fla. July 12, 2012) (Gold., J) (addressing kickback scheme based on below-market rental rates and other leasing perks).

13

As West Coast ASC recognizes (Dkt. 123 at 10-11), *Bingham* is distinguishable. There, the relator provided "specific data regarding clear compensation arrangements between [the referring physicians and defendant] through cash flow participation agreements."[5] *Bingham*, 2016 WL 344887 at *8; *accord Baycare Health Sys.*, 2015 WL 4878456 at *4-5 (noting that relator pleaded kickback scheme with specificity, including the existence of direct compensation agreements). Here, the alleged kickback scheme is not alleged with such clarity.

Further, as AAA and All Services Anesthesia recognize (Dkt. 119 at 9-10), *Bingham*, at least as applied to the facts alleged here, is in some tension with both published and recent unpublished Eleventh Circuit cases. Although the Eleventh Circuit instructs that "indicia of reliability" is assessed on a case-by-case basis, *Mastej*, 591 F. App'x at 708, a relator must include reliable allegations that an actual false claim was presented. *See Mastej*, 591 F. App'x at 708-710 (rejecting relator's claim for certain time periods as lacking indicia of reliability, despite the fact that the alleged fraud "does not depend as much on the particularized medical or billing content of any given claim form"); *Jallali v. Sun Healthcare Grp.*, 667 F. App'x 745, 746 (11th Cir. 2016) ("Jallali fails to allege the 'who, what, where, when, and how' of any specific false claim for payment"); *Clausen*, 290 F.3d at 1311 (Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted

---

[5] Also in *Bingham* and *Baycare*, the relator's complaint included the names of *referring* physicians and each physician's aggregate number of Medicare patient referrals to the relevant hospital. *Bingham*, 2016 WL 344887, at *8; *Baycare*, 2015 WL 4878456 at *5. Here, the Third Amended Complaint alleges that Medicare patients were *treated* by anesthesia providers (Dkt. 110 at ¶ 114), but the complaint does not plead that those patients necessarily overlapped with patients referred in exchange for kickbacks. *See Mastej*, 591 F. App'x at 706 (emphasizing that "Defendants' claims had to be for a specific type of Medicare patient, or a 'patient-specific' referral, in order to be false. . . . Therefore, we examine what the complaint says about referred patients and whether the complaint sufficiently alleges submission and payment of interim claims for treatment of patients who were referred by the ten doctors or one of them.")

to the Government.") Here, Relator merely speculates that an unlawful kickback scheme exists and, by extension, asserts that all Medicare claims were "tainted." (Dkt. 110 at ¶ 105)

Under the Anti-Kickback Statute, "a claim" is actionable under the False Claims Act when it "includes items or services *resulting from*" a violation of the Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(g) (emphasis added). While the defendants may have presented claims to Medicare, absent allegations that a claim was tied to a kickback, Relator fails to allege a plausible cause of action under 31 U.S.C. § 3729(a)(1)(A).

### 4. Violation of 31 U.S.C. § 3729(a)(1)(B)

In Count II, Relator alleges that the Choudhry defendants violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), which provides a cause of action against any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The Third Amended Complaint, however, tracks the language of an earlier version of the statute, formerly codified at 31 U.S.C. § 3729(a)(2), which imposed liability when a person "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government."[6] (Dkt. 110 at ¶ 258)

Regardless, under either version, Count II fails to identify what "false record or statement" was made or used. In response to the motions to dismiss, Relator appears to contend that it is pursuing an implied false-certification theory under *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). (Dkt. 142 at 7, 11, 13-14) However, Relator neglects to

---

[6] Under the prior version of the statute, a relator was required to allege the actual "payment" of a claim, *Hopper*, 588 F.3d at 1327-28, but the Eleventh Circuit has not resolved whether the current version of the statute requires actual payment. *Urquilla-Diaz*, 780 F.3d at 1045 n.6; *Mastej*, 591 F. App'x at 710. Relator is discouraged from placing primary reliance on secondary sources, including the publication "What is Qui Tam," apparently authored by Relator's counsel. (*E.g.*, Dkt. 142 at 8)

15

acknowledge that the Supreme Court adopted that theory under the specific language of subsection 3729(a)(1)(A), not subsection 3729(a)(1)(B). *Escobar*, 136 S. Ct. at 1995-96, 1999; *accord McNutt*, 423 F.3d at 1259 (employing an implied false-certification theory under the prior version of subsection 3729(a)(1)(A)); *see also Urquilla-Diaz*, 780 F.3d at 1045 & n.6 (prior to *Escobar*, adopting a false certification theory under the former version of subsection 3729(a)(1)(B), without distinguishing express and implied certification). Moreover, as noted in footnote 1, *supra*, it is questionable whether an implied false-certification theory remains necessary or viable in light of the 2010 amendment to the Anti-Kickback Statute, a question that *Escobar* had no occasion to address because that case did not involve kickbacks.

Relator must clarify the factual basis for Count II and incorporate by reference only the relevant supporting facts. Count II is therefore dismissed with leave to amend.

### 5. Florida False Claims Act

In Count III, Relator brings a parallel claim under the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq*. Relator does not dispute that its Florida claim is subject to the same pleading standards as the federal claims. *Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 719 n.1 (11th Cir. 2012); *Barys ex rel. United States v. Vitas Healthcare Corp.*, 298 F. App'x 893, 894 n.1 (11th Cir. 2008). For the reasons stated, Count III is dismissed without prejudice.

## CONCLUSION

Accordingly,

(1) The motions to dismiss the Third Amended Complaint, filed by defendants North Pinellas Surgery Center, LLC (Dkt. 116), Clearwater Ambulatory Surgery Centers, Inc. d/b/a Clearwater Endoscopy Center (Dkt. 117), Advanced Anesthesia Associates, LLC and All Services

Anesthesia, LLC (Dkt. 119), Umesh Choudhry and Curvv, LLC (Dkt. 120), Safety Harbor Surgery Center, LLC (Dkt. 122), E Street Endoscopy LLC d/b/a West Coast Endoscopy Center (Dkt. 123), and Physicians Endoscopy Holdings Inc. and St. Petersburg Endoscopy, LLC (Dkt. 126) are **GRANTED** to the extent that Relator's claims are **DISMISSED WITHOUT PREJUDICE** and with one final opportunity to amend.

(2) Relator is granted leave to file a Fourth Amended Complaint on or before **June 28, 2017**, which shall comply with Rules 8(a) and 9(b) in all respects. If Relator fails to amend within this time, this action will be dismissed with prejudice and without further notice, except that the claims of the government will be dismissed without prejudice.

**DONE AND ORDERED** this 13th day of June, 2017.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record