UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA, THE
STATE OF FLORIDA, *ex rel.* FLORIDA
SOCIETY OF ANESTHESIOLOGISTS,

    Plaintiffs/Relators,

vs.

                                          Case No. 8:13-cv-2603-T-27AEP

UMESH CHOUDHRY, *et al.*,

    Defendants.
_____/

## ORDER

**BEFORE THE COURT** are motions to dismiss the Third Amended Complaint filed by defendants Jack Groover (Dkt. 121) and Jax Anesthesia Providers, LLC, SouthPoint Anesthesia, LLC, Borland-Groover Clinic, P.A., and BGC Holdings, Inc. (Dkt. 127), to which Florida Society of Anesthesiologists ("Relator") has filed a consolidated response in opposition (Dkt. 141). Upon consideration, the motions to dismiss are **GRANTED**, to the extent that the claims are dismissed without prejudice and with one final opportunity to amend.

## BACKGROUND

Relator, a not-for-profit professional organization consisting of nearly 2,000 anesthesiologists throughout Florida. (Dkt. 110 at ¶ 6) Relator alleges that health care providers violated the False Claims Act, 31 U.S.C. § 3729(a)(1), and the Florida Medicaid False Claims Act, Fla. Stat. §§ 68.081, *et seq.*, by seeking reimbursement for anesthesia services that were tainted by a kickback scheme. This order addresses the claims against defendants Dr. Jack Groover and his related companies, which are centered on the east coast of Florida. A separate order addresses the claims

against Dr. Umesh Choudhry and his companies, centered on the west coast of Florida.[1]

According to Relator, the kickback scheme involves surgeons at Groover-owned ambulatory surgical centers who refer patients to Groover-owned anesthesia companies. The anesthesia companies pay contractors to provide anesthesia services (anesthesiologists or nurse anesthetists) at a lower rate than ultimately reimbursed by Medicare. (Dkt. 110 at ¶¶ 227, 239) The anesthesia company then uses the "spread" or "delta" between the contractor's rate and the Medicare reimbursement to pay kickbacks to the surgeons. (*Id.*) Essentially, this arrangement allows surgeons to receive a portion of the anesthesia revenues, despite the fact that the surgeons are not anesthesiologists. (*Id.* at ¶¶ 30-32) Relator alleges that the kickback scheme results in overutilization of anesthesia and attendant harm to patients. (*Id.* at ¶ 231)

The term "company model" refers to an arrangement by which surgeons own the anesthesia companies from which they extract revenue. (*Id.* at ¶¶ 24, 238) On June 1, 2012, the Office of the Inspector General (OIG) for the Department of Health and Human Services issued Advisory Opinion No. 12-06, which determined that two proposed financial arrangements between an anesthesia company and physician-owned corporations "could potentially generate prohibited remuneration" in violation the federal Anti-Kickback Statute.[2] (Dkt. 110-4) Although that opinion was highly fact-specific, Relator alleges that the defendants' scheme uses "[a]nalogous practices," with "some permutations." (Dkt. 110 at ¶¶ 237, 241)

However, the facts alleged in the Third Amended Complaint are thin. Relator acknowledges that it does not know "the exact amount and mechanism for the funneling of the kickbacks." (*Id.* at

---

[1] The two orders will therefore necessarily duplicate certain background discussion and the applicable standards.

[2] "[A] claim that includes items or services resulting from" a violation of the federal Anti-Kickback Statute is a "false" claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

¶¶ 186, 212) Similarly, in response to the motions to dismiss, Relator admits that "[o]nly the companies and individuals who internally divided up and carried out the kickbacks know how the scheme worked." (Dkt. 141 at 30) As the defendants point out, Relator's lack of inside knowledge is not surprising, given that Relator is a corporate outsider, in contrast to the typical *qui tam* relator. Relator's most salient facts follow.

Jack Groover is a gastrointestinal physician and surgeon. (Dkt. 110 at ¶ 17) Groover controls four defendants named in this action: Borland-Groover Clinic, P.A. ("the Clinic"), BGC Holdings, Inc. ("the Holding Company"), Jax Anesthesia Providers, LLC ("Jax Anesthesia"), and SouthPoint Anesthesia, LLC ("SouthPoint Anesthesia"). (*Id.* at ¶¶ 142-146)

Through the Clinic and/or the Holding Company, Groover co-owns several ambulatory surgical centers (ASCs). (*Id.* at ¶¶ 142, 147, 165) The ASCs, which Relator has dropped as named defendants, include Fleming Island Surgery Center, SouthPoint Surgery Center, and Orange Park Surgery Center. (*Id.* at ¶¶ 147, 171, 208; *see* Dkt. 5) Jax Anesthesia and SouthPoint Anesthesia supply anesthesia services to the ASCs. (Dkt. 110 at ¶¶ 149-151)

Relator alleges in conclusory fashion that the Clinic "directly or indirectly through its physician owners" referred patients to Jax Anesthesia and SouthPoint Anesthesia for anesthesia services, and in turn, "received directly or indirectly through its physician owners kickbacks for the anesthesia referrals." (*Id.* at ¶ 154) And physician-surgeons at the ASCs "referred anesthesia services to Groover in exchange for kickbacks." (*Id.* at ¶ 155) Relator defines "Groover" to mean Groover individually and "all the companies set forth herein." (*Id.* at ¶ 153)

Relator maintains that a kickback scheme can be "reliably inferred" because Groover induced Fleming Island ASC and Orange Park ASC to terminate their contracts with independent anesthesia providers in favor of Jax Anesthesia, based on the promise that Jax Anesthesia would pay kickbacks

3

for anesthesia referrals. (*Id.* at ¶¶ 172, 176, 179, 183, 186) Relator alleges that it knows that Groover paid kickbacks "for at least one-year as a result of direct interactions" between one of Relator's members and "a Fleming Island and/or Orange Park . . . owner who readily admitted on multiple occasions that, in exchange for anesthesia referrals, Groover paid [the] referrers a share of the anesthesia revenue of Jax Anesthesia." (*Id.* at ¶ 187) Additionally, an owner "expressed outrage" when Groover terminated this arrangement and "took bonuses away." (*Id.* at ¶¶ 188-191)

Relator raises similar allegations with respect to SouthPoint ASC, which replaced its independent anesthesia provider with defendant SouthPoint Anesthesia. (*Id.* at ¶¶ 207-214). Relator alleges, "[u]pon information and belief," that Groover induced SouthPoint ASC to make the change by promising to pay kickbacks. (*Id.* at ¶ 211) Again, Relator does not know "the exact mechanism by which kickbacks were funneled," but alleges that "an insider of Southpoint ASC," based on discussions with other ASC owners, reported that the impetus of the change was Groover's promise to let physicians "keep some of the anesthesia revenue." (*Id.* at ¶ 212) Physicians "have openly boasted to [Relator's] members that they were receiving anesthesia 'stipends' all along and that this lawsuit has stopped them from getting their 'full' anesthesia stipend[.]" (*Id.* at ¶ 219)

The Third Amended Complaint alleges that Jax Anesthesia submitted bills to Medicare for anesthesia services on behalf of Mary Jane Kohm, M.D., and nurse anesthetists Russell Scott Avera, Adam Boyd, Patrick G. Bailey, and Eric Seybolt, as follows:

> Kohm ($296,064 in charges for 546 beneficiaries), Avera ($167,976 in charges for 322 beneficiaries), Boyd ($266,038 in charges for 527 beneficiaries), Bailey ($340,343 in charges for 618 beneficiaries), and Seybolt ($318,756.40 in charges for 765 beneficiaries).

(*Id.* at ¶¶ 204-205) Relator alleges that SouthPoint Anesthesia submitted bills for Tiffani King, M.D. ($36,104.27 for 42 Medicare beneficiaries), Mark Zapp ($22,857.28 for 101 Medicare beneficiaries),

4

and David Shapiro ($14,680.17 for 29 Medicare beneficiaries). (*Id.* at ¶ 226) The defendants contend that these allegations are based on readily-available public information. (*E.g.*, Dkt. 127 at 2)

Relator maintains that Jax Anesthesia and SouthPoint Anesthesia paid these providers "significantly" less than the anesthesia fees reimbursed by Medicare, with the difference being used to fund kickbacks to the referring surgeons. (Dkt. 110 at ¶¶ 203, 227) Relator further alleges that surgeons "sought to maximize those kickbacks by substantially increasing the frequency with which anesthesia was rendered to patients." (*Id.* at ¶ 229) In particular, "cases which did not need anesthesia received anesthesia anyway without a commensurate increase in patient care." (*Id.* at ¶ 230)

## STANDARD

The Third Amended Complaint must satisfy two pleading standards. First, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but more than an unadorned, conclusory accusation of harm are. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must "plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And while "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678.

Second, the complaint must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1310 (11th Cir. 2002). The particularity requirement of Rule 9(b) is satisfied if the complaint alleges "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper v.*

5

*Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009).

**DISCUSSION**

1.  **Shotgun pleading**

Relator's previous complaint was dismissed for two reasons. First, the complaint identified two distinct kickback schemes, the scheme involving the Groover defendants and a similar scheme involving Dr. Umesh Choudhry and his businesses. Relator failed to include any facts connecting the two schemes, however. Second, Relator impermissibly lumped together all defendants. (Dkt. 108 at 3-5)

The Third Amended Complaint suffers from similar defects. Relator now identifies a "Groover Ring" and a "Choudhry Ring" and pleads separate claims against each group. (Dkt. 110 at ¶¶ 254-269) But Relator again pleads no facts connecting the two schemes, apart from alleging that both used an improper company model. (*Id.* at ¶¶ 248-250) Relator concedes that severing the claims would remedy this defect. (Dkt. 141 at 31)

More problematic, however, Relator pleads its claims against the Groover defendants collectively, despite the fact that they apparently possessed different roles in the alleged fraud. (*Id.* at ¶¶ 262-269) And the supporting factual allegations define the term "Groover" to refer to Groover and his entities collectively, without differentiation. (*Id.* at ¶ 153)

Based on these deficiencies, the Third Amended Complaint is due to be dismissed. *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1323 & n.14 (11th Cir. 2015); *Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007). If Relator files a Fourth Amended Complaint, Relator must identify specific defendants in its factual allegations, plead separate counts against each defendant (or group of defendants, if related), and incorporate by

reference only the facts relevant to each defendant. Relator shall also omit extraneous "background" information and legal argument.

## 2. Anti-Kickback Statute

The federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits a person from paying or receiving kickbacks to induce the referral of an individual for services paid under a federal health care program. 42 U.S.C. § 1320a-7b(b)(1)-(2). In 2010, Congress amended the statute to specify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g). Relator's claims under the False Claims Act are premised on underlying violations of the Anti-Kickback Statute.[3] (Dkt. 110 at ¶ 37)

A violation of the Anti-Kickback Statute occurs when a defendant: (1) knowingly and wilfully, (2) "offers or pays any remuneration," directly or indirectly, (3) to induce a person to refer individuals to the defendants for the furnishing of medical services, (4) paid for by Medicare. *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 705 (11th Cir. 2014) (citing 42 U.S.C. § 1320a-7b(b)(2)(A)). In a tandem provision, the Anti-Kickback Statute prohibits "solicit[ing] or receiv[ing] any remuneration." 42 U.S.C. § 1320a-7b(b)(1)(A).

Relator must allege the kickback scheme with particularity under Rule 9(b), including the

---

[3] Prior to the 2010 amendment, the Eleventh Circuit determined that a violation of the Anti-Kickback Statute was actionable under the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), pursuant to an "implied false certification" theory. *E.g., McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259-60 (11th Cir. 2005); *United States ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 799 (11th Cir. 2014) (characterizing *McNutt* as an implied false-certification case). The parties do not address whether that theory remains necessary or viable in light of the amendment to the Anti-Kickback Statute. *Compare United States ex rel. Lutz v. Blue Eagle Farming, LLC*, 853 F.3d 131, 135 (4th Cir. 2017) (holding that a violation of the Anti-Kickback Statute "that results in a federal health care payment is a *per se* false claim"), *with United States ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 335 (S.D.N.Y. 2014) (holding that the amendment "did nothing to alter the false certification theory of claim 'falsity'")..

"time, place, and substance of the defendant's alleged fraud." *Hopper*, 588 F.3d at 1324 (internal quotation marks omitted); *Mastej*, 591 F. App'x at 705-706. For example, a relator satisfies Rule 9(b) by alleging "the names of the doctors who received the incentives, the names of the defendants' employees who negotiated the incentives with the doctors, precisely what the incentives were, when they were provided, why they were provided, and why they were illegal." *Id.* at 705.

The Third Amended Complaint fails to identify with particularity who arranged the kickbacks, who received the kickbacks, precisely what the incentives were, or when and how they were provided. Indeed, Relator admits that it does not know "the exact amount and mechanism for the funneling of the kickbacks back to the ASCs/referrers." (Dkt. 110 at ¶¶ 186, 212) At most, Relator alleges that unidentified sources reported that Groover paid referrers "a share of the anesthesia revenue" and "bonuses" or "stipends." (*Id.* at ¶¶ 174, 187-88, 190, 194, 212, 219) But Relator is not permitted to simply label the defendants' financial arrangements as a "kickback" without supporting details.

Alternatively, Relator alleges that "the payment of the kickbacks can reliably be inferred," because the ASCs terminated their relationship with the independent anesthesia companies. (*Id.* at ¶ 186) But conjecture plainly does not satisfy Rule 9(b) pleading standards.

To the extent Relator argues that the "company model" itself qualifies as a violation of the Anti-Kickback Statute, pursuant to the OIG's Advisory Opinion No. 12-06, Relator provides no authority for such a conclusion. *United States ex rel. McDonough v. Symphony Diagnostic Servs., Inc.*, 36 F. Supp. 3d 773, 780 (S.D. Ohio 2014) (noting that an OIG advisory opinion does not render a practice *per se* unlawful); *Hericks v. Lincare Inc.*, No. CIV.A. 07-387, 2014 WL 1225660, at *12 (E.D. Pa. Mar. 25, 2014) (same). The opinion expressly stated that it "has no applicability to other

arrangements, even those which appear similar in nature or scope," and the OIG concluded only that the facts at issue "*could potentially* generate prohibited remuneration under the anti-kickback statute." (Dkt. 110-4 at 1-2, 11 (emphasis added))

Relator is not permitted to conclusorily assert that the defendants are receiving kickbacks and then pursue discovery to support its allegations. Rule 9(b)'s particularity requirement "serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (internal quotation marks omitted). "When a plaintiff does not specifically plead the minimum elements of their allegation, it enables them to learn the complaint's bare essentials through discovery and may needlessly harm a defendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *Clausen*, 290 F.3d at 1313 n.24.

Although Relator will be granted one final opportunity to amend to correct these deficiencies, Relator must satisfy the Rule 9(b) pleading standards.

### 3. False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

Even if Relator successfully pleaded an underlying violation of the Anti-Kickback Statute, Relator must allege a violation of the False Claims Act. In Count IV, Relator alleges that the Groover defendants violated 31 U.S.C. § 3729(a)(1)(A), which provides a cause of action against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Under this provision, the "central question" is whether defendants "presented or caused to be presented" a false claim. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1052 (11th Cir. 2015)

(quoting *Hopper*, 588 F.3d at 1325-26).

To satisfy the presentment requirement, a relator "must allege the actual presentment of a claim . . . with particularity, meaning particular facts about the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Urquilla-Diaz*, 780 F.3d at 1052 (internal quotation marks omitted)."Providing exact billing data (name, date, amount, and services rendered), or attaching a representative sample claim is one way a complaint can establish the necessary indicia of reliability that a false claim was actually submitted." *Mastej*, 591 F. App'x at 704. Alternatively, "a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims." *Id.* But "[i]t is not enough for the plaintiff-relator to state baldly that he was aware of the defendants' billing practices, to base his knowledge on rumors, or to offer only conjecture about the source of his knowledge." *Id.* at 704-705 (internal citations omitted).

Relator concedes that it possesses no specific claims or billing data. (Dkt. 110 at ¶ 44) And although Relator speculates as to the defendants' billing practices, Relator fails to plead any facts suggesting that it has "direct, first-hand knowledge"of those practices. (*Id.* at ¶¶ 197-206, 220-227); *Mastej*, 591 F. App'x at 704. Relator does not assert that any of its members (or anyone else) is even minimally acquainted with the claims practices for any defendant. *See United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1303 n.4 (11th Cir. 2010) (rejecting relator's vague allegations that the she had "found" unspecified documents, and "discovered" or "learned" that defendants submitted false claims); *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005)(rejecting relator's allegation that he was "aware" of billing practices because it "was neither particular to any specific

fraudulent claim against the government nor factually supported"); *Atkins*, 470 F.3d at 1358-1359 (rejecting relator's allegations that were based on rumor).

Contrary to Relator's argument in response to the motions to dismiss, its status as a corporate outsider does not excuse its obligation to come forward with reliable allegations. In fact, the Eleventh Circuit categorically rejects that argument:

> We are not unsympathetic to the situation in which [the relator] finds himself. Most relators in *qui tam* actions are insiders. As a corporate outsider, he may have had to work hard to learn the details of the alleged schemes entered into by LabCorp through years of making contacts in and learning about the industry while not being privy to LabCorp's policy manuals, files and computer systems. But, while an insider might have an easier time obtaining information about billing practices and meeting the pleading requirements under the False Claims Act, *neither the Federal Rules nor the Act offer any special leniency under these particular circumstances to justify [the relator] failing to allege with the required specificity the circumstances of the fraudulent conduct he asserts in his action.*

*Clausen*, 290 F.3d at 1314 (emphasis added).

Relator relies on a Souther District of Florida decision, in which the alleged kickbacks consisted of favorable lease agreements and a parking easement for the referring physicians. *United States ex rel. Bingham v. HCA, Inc.*, No. 13-23671-CIV, 2016 WL 344887 (S.D. Fla. Jan. 28, 2016) (Cooke, J.). The relator in *Bingham* did not allege that any specific claim was presented to the government for payment, but instead relied on publicly-available information regarding the defendant's revenues from Medicare and Medicaid, and the names of referring physicians and their aggregate number of Medicare patient referrals to the defendant's hospital. *Id.* at *8. The court observed that the alleged fraud "does not depend as much on the particularized billing content of any given claim;" rather, "improper relationships with referring physicians taint every claim submitted as a result of those referrals." *Id.*

Based on the facts alleged, the court held that the relator provided sufficient "indicia of

11

reliability" that defendant actually submitted false claims. *Id.*; *accord United States v. Baycare Health Sys.*, No. 8:14-CV-73, 2015 WL 4878456 at *2-5 (M.D. Fla. Aug. 14, 2015) (Merryday, J.) (addressing kickback scheme based on rent concessions and a parking easement); *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, No. 09-22253-CIV, 2012 WL 2871264 at *1, 5-6 (S.D. Fla. July 12, 2012) (Gold., J) (addressing kickback scheme based on below-market rental rates and other leasing perks).

As one of the Choudhry-owned entities recognizes (Dkt. 123 at 10-11), *Bingham* is distinguishable because the relator in that case provided "specific data regarding clear compensation arrangements between [the referring physicians and defendant] through cash flow participation agreements."[4] *Bingham*, 2016 WL 344887 at *8; *accord Baycare Health Sys.*, 2015 WL 4878456 at *4-5 (noting that relator pleaded kickback scheme with specificity, including the existence of direct compensation agreements). Here, the kickback scheme is not alleged with such clarity.

Moreover, as other Choudhry entities recognize (Dkt. 119 at 9-10), *Bingham*, at least as applied to the facts alleged here, is in some tension with both published and recent unpublished Eleventh Circuit cases. Although the Eleventh Circuit instructs that "indicia of reliability" is assessed on a case-by-case basis, *Mastej*, 591 F. App'x at 708, a relator must still include some reliable allegation that an actual false claim was presented. *See Mastej*, 591 F. App'x at 708-710 (rejecting relator's claim for certain time periods as lacking indicia of reliability, despite the fact that the

---

[4] Also in *Bingham* and *Baycare*, the relator's complaint included the names of *referring* physicians and each physician's aggregate number of Medicare patient referrals to the relevant hospital. *Bingham*, 2016 WL 344887, at *8; *Baycare*, 2015 WL 4878456 at *5. Here, the Third Amended Complaint alleges that Medicare patients were *treated* by anesthesia providers (Dkt. 110 at ¶¶ 205, 226), but the complaint does not plead that those patients necessarily overlapped with patients referred in exchange for kickbacks. *See Mastej*, 591 F. App'x at 706 (emphasizing that "Defendants' claims had to be for a specific type of Medicare patient, or a 'patient-specific' referral, in order to be false. ... Therefore, we examine what the complaint says about referred patients and whether the complaint sufficiently alleges submission and payment of interim claims for treatment of patients who were referred by the ten doctors or one of them.")

12

alleged fraud "does not depend as much on the particularized medical or billing content of any given claim form"); *Jallali v. Sun Healthcare Grp.*, 667 F. App'x 745, 746 (11th Cir. 2016) ("Jallali fails to allege the 'who, what, where, when, and how' of any specific false claim for payment"); *Clausen*, 290 F.3d at 1311 (Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.") Here, Relator merely speculates that an unlawful kickback scheme exists and, by extension, asserts that all Medicare claims were "tainted." (Dkt. 110 at ¶¶ 182, 216)

Under the Anti-Kickback Statute, "a claim" is actionable under the False Claims Act when it "includes items or services *resulting from*" a violation of the Anti-Kickback Statute. 42 U.S.C. § 1320a-7b(g) (emphasis added). While the defendants may have presented claims to Medicare, absent allegations that a claim is tied to a kickback, Relator fails to allege a plausible cause of action under 31 U.S.C. § 3729(a)(1)(A).

### 4. Violation of 31 U.S.C. § 3729(a)(1)(B)

In Count V, Relator alleges that the Groover defendants violated 31 U.S.C. § 3729(a)(1)(B), which provides a cause of action against any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." The Third Amended Complaint, however, tracks the language of an earlier version of the statute, formerly codified at 31 U.S.C. § 3729(a)(2), which imposed liability when a person "knowingly makes, uses, or causes to made or used, a false record or statement to get a false or fraudulent claim paid or

13

approved by the Government."[5] (Dkt. 110 at ¶ 266)

Under either version of the statute, Count V fails to identify what "false record or statement" is at issue. In response to the motions to dismiss, Relator appears to contend that it is pursuing an implied false-certification theory under *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). (Dkt. 141 at 6, 10, 12-13) However, Relator neglects to acknowledge that the Supreme Court adopted that theory under the specific language of subsection 3729(a)(1)(A), not subsection 3729(a)(1)(B). *Escobar*, 136 S. Ct. at 1995-96, 1999; *accord McNutt*, 423 F.3d at 1259 (employing an implied false-certification theory under the prior version of subsection 3729(a)(1)(A)); *but see Urquilla-Diaz*, 780 F.3d at 1045 & n.6 (prior to *Escobar*, adopting a false certification theory under the former version of subsection 3729(a)(1)(B), without distinguishing express and implied certification). Moreover, as noted in footnote 1, *supra*, it is questionable whether an implied false-certification theory remains necessary or viable in light of the 2010 amendment to the Anti-Kickback Statute, a question that *Escobar* had no occasion to address because that case did not involve kickbacks.

Relator must clarify the factual basis for Count V and incorporate by reference only the relevant supporting facts. Count V is therefore dismissed with leave to amend.

### 5. Florida False Claims Act

In Count VI, Relator brings a parallel claim under the Florida False Claims Act, Fla. Stat. §§ 68.081, *et seq.* Relator does not dispute that its Florida claim is subject to the same pleading

---

[5] Under the prior version of the statute, a relator was required to allege the actual "payment" of a claim, *Hopper*, 588 F.3d at 1327-28, but the Eleventh Circuit has not resolved whether the current version of the statute requires actual payment. *Urquilla-Diaz*, 780 F.3d at 1045 n.6; *Mastej*, 591 F. App'x at 710. Although the issue of payment is not dispositive here, the parties are encouraged to address this issue in future filings, as necessary. Relator is discouraged from placing primary reliance on secondary sources, including the publication "What is Qui Tam," apparently authored by Relator's own counsel. (*E.g.*, Dkt. 141 at 7)

standards as the federal claims. *Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 719 n.1 (11th Cir. 2012); *Barys ex rel. United States v. Vitas Healthcare Corp.*, 298 F. App'x 893, 894 n.1 (11th Cir. 2008). For the reasons stated, Count VI is dismissed without prejudice.

## CONCLUSION

Accordingly,

(1) The motions to dismiss the Third Amended Complaint by defendants Jack Groover (Dkt. 121) and Jax Anesthesia Providers, LLC, Southpoint Anesthesia, LLC, Borland-Groover Clinic, P.A., and BGC Holdings, Inc. (Dkt. 127) are **GRANTED** to the extent that Relator's claims are **DISMISSED WITHOUT PREJUDICE**, with one final opportunity to amend.

(2) Relator may file a Fourth Amended Complaint on or before **June 28, 2017**, which shall comply with Rules 8(a) and 9(b) in all respects. If Relator fails to amend within this time, this action will be dismissed with prejudice and without further notice, except that the claims of the government will be dismissed without prejudice.

**DONE AND ORDERED** this 13th day of June, 2017.

JAMES D. WHITTEMORE
United States District Judge

Copies to: Counsel of Record